RONALD M. ARLAS, ESQ. #59091
ARLAS & SMITHTON
100 Wood Hollow Drive
Novato, CA 94945
(415) 878-5390
Fax (415) 878-3595

EDWARD R. BUELL, ESQ. #240494
GREENPOINT MORTGAGE FUNDING, INC.
100 Wood Hollow Drive
Novato, Ca. 94945
(415) 878-5616
Fax (4150 878-3593

Attorneys for Defendant
GREENPOINT MORTGAGE FUNDING, INC.

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
**(San Jose Division)**

| | |
|---|---|
| RICK YU et al.<br><br>                    Plaintiffs,<br><br>          vs.<br><br>UTAH FINANCIAL, et al.<br>                    Defendants. | Case No. C O8-01771-RMW-PVT<br><br>[Assigned to Magistrate Patricia V. Trumbell]<br><br>ANSWER OF DEFENDANT GREENPOINT MORTGAGE FUNDING, INC. |

### ANSWER

Defendant GreenPoint Mortgage Funding, Inc. ("GPM") hereby answers the Complaint filed by Plaintiffs Rick Yu and Serlyn Yu ("Plaintiffs" or "Yu") on March 4, 2008. Except as expressly admitted herein, all allegations in the Complaint are denied.

### General Allegations

1.       Paragraph 1 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 1 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.                                                          C O8-01771-RMW-PVT

the allegations contained in paragraph 1 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 1.

2.    Paragraph 2 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 2 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 2 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 2.

3.    Paragraph 3 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 3 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 3 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 3.

4.    Paragraph 4 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 4 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 4 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 4.

5.    Defendant GPM denies that it is or at any time was a California Corporation. GPM admits that its corporate headquarters is located in Novato, California. Except as expressly admitted herein, GPM denies the allegations in paragraph 5.

6.    Paragraph 6 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 6 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.                                            C O8-01771-RMW-PVT

the allegations contained in paragraph 6 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 6.

7.     GPM denies the allegations contained in paragraph 7.

8.     GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 8 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 8.

9.     Paragraph 9 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 9 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 9 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 9.

10.     Paragraph 10 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 10 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 10 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 10.

11.     Paragraph 11 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 11 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 11 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 11.

12.     Paragraph 12 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 12

requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 12 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 12.

13.    Paragraph 13 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 13 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 13 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 13.

14.    Paragraph 14 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 14 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 14 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 14.

15.    GPM admits only that the document cited in paragraph 15 speaks for itself. Except as expressly admitted herein, GPM denies the allegations in paragraph 15.

16.    GPM admits only that the loan documents associated with the loans referred to in paragraph 16 speak for themselves. Except as expressly admitted herein, GPM denies the allegations in paragraph 16.

17.    Paragraph 17 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 17 requires an answer, GPM admits only that the loan documents associated with the loans referred to in paragraph 17 speak for themselves. Except as expressly admitted herein, GPM denies the allegations in paragraph 17.

-4-

18.    Paragraph 18 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 18 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 18 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 18.

19.    Paragraph 19 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 19 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 19 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 19.

20.    Paragraph 20 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 20 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 20 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 20.

21.    Paragraph 21 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 21 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 21 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 21.

22.    Paragraph 22 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 22 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the allegations contained in paragraph 22 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 22.

23.    Paragraph 23 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein.  To the extent that paragraph 23 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 23 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 23.

<div align="center">

**FIRST CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**
**(Against Utah Financial, Inc. Smith, Morrison and DOES 1 through 20, inclusive)**

</div>

24.    GPM hereby incorporates by reference, as if fully set forth herein, its answers and responses in paragraphs 1 through 23 above.

25.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 25 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein.  To the extent that paragraph 25 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 25 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 25.

26.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 26 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein.  To the extent that paragraph 26 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 26 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 26.

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.

C 08-01771-RMW-PVT

27.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 27 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 27 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 27 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 27.

28.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 28 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 28 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 28 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 28.

**SECOND CAUSE OF ACTION**
**(Negligent Misrepresentation)**
**(Against Utah Financial, Inc. Smith, Morrison and Does 1 through 20)**

29.    GPM hereby incorporates by reference, as if fully set forth herein, its answers and responses in paragraphs 1 through 28 above.

30.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 30 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 30 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 30 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 30.

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.

C 08-01771-RMW-PVT

31.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 31 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 31 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 31 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 31.

32.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 32 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 32 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 32 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 32.

### THIRD CAUSE OF ACTION
**(Intentional Misrepresentation)**
**(Against Utah Financial, Inc. Smith, Morrison and Does 1 through 20)**

33.    GPM hereby incorporates by reference, as if fully set forth herein, its answers and responses in paragraphs 1 through 28 above.

34.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 34 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein. To the extent that paragraph 34 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 34 and on that basis GPM denies the allegations contained in said paragraph. Except as expressly admitted herein, GPM denies the allegations in paragraph 34.

-8-

35.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 35 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein.  To the extent that paragraph 35 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 35 and on that basis GPM denies the allegations contained in said paragraph.  Except as expressly admitted herein, GPM denies the allegations in paragraph 35.

36.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 36 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein.  To the extent that paragraph 36 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 36 and on that basis GPM denies the allegations contained in said paragraph.  Except as expressly admitted herein, GPM denies the allegations in paragraph 36.

37.    Defendant GPM states that this First Claim for Relief clearly does not apply to GPM and therefore paragraph 37 does not contain any material allegations concerning GPM and, on that basis, GPM does not respond to the statements contained therein.  To the extent that paragraph 37 requires an answer, GPM lacks sufficient knowledge, information or belief to either admit or deny the allegations contained in paragraph 37 and on that basis GPM denies the allegations contained in said paragraph.  Except as expressly admitted herein, GPM denies the allegations in paragraph 37.

## FOURTH CAUSE OF ACTION
**(Violation of the Real Estate Settlement Procedures Act (RESPA) 12 U.S.C. §§2601, et seq.)**
**(Against All Defendants)**

38.    GPM hereby incorporates by reference, as if fully set forth herein, its answers and responses in paragraphs 1 through 37 above.

39.    Paragraph 39 states conclusions of law to which no response is required.

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.

C O8-01771-RMW-PVT

40.  Paragraph 40 states conclusions of law to which no response is required.  To the extent that paragraph 40 requires an answer, GPM denies the allegations contained in paragraph 40.

41.  Paragraph 41 states conclusions of law to which no response is required.  To the extent that paragraph 41 requires an answer, GPM denies the allegations contained in paragraph 41.

42.  Paragraph 41 states conclusions of law to which no response is required.  To the extent that paragraph 41 requires an answer, GPM denies the allegations contained in paragraph 41.

### FIFTH CAUSE OF ACTION
**(Violation of Business and Professions Code section 17200, et seq.)**
**(Against All Defendants)**

43.  GPM hereby incorporates by reference, as if fully set forth herein, its answers and responses in paragraphs 1 through 42 above.

44.  GPM denies the allegations contained in paragraph 44.

45.  Paragraph 45 states conclusions of law to which no response is required.  To the extent that paragraph 45 requires an answer, GPM denies the allegations contained in paragraph 45.

46.  Paragraph 46 states conclusions of law to which no response is required.  To the extent that paragraph 46 requires an answer, GPM denies the allegations contained in paragraph 46.

47.  Paragraph 47 states conclusions of law to which no response is required.  To the extent that paragraph 47 requires an answer, GPM denies the allegations contained in paragraph 47.

48.  Paragraph 48 states conclusions of law to which no response is required.  To the extent that paragraph 48 requires an answer, GPM denies the allegations contained in paragraph 48.

### PRAYER FOR RELIEF

1.  GPM denies that Plaintiffs are entitled to any relief, including but not limited to the relief sought in sub-parts 1 through 8 of the "Prayer for Relief."

-10-

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.

C 08-01771-RMW-PVT

WHEREFORE, GPM seeks relief in its favor as prayed for herein, including a judgment in its favor, dismissal of this action, an award of costs, an award of reasonable attorneys' fees, and such other and further relief as the Court deems appropriate.

Defendant GPM does not request a jury trial on any issues.

## AFFIRMATIVE DEFENSES OF
## DEFENDANT GREENPOINT MORTGAGE FUNDING, INC.

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs' Complaint, and each and every cause of action therein, fails to state facts sufficient to constitute a cause of action, or causes of action, against GPM.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' Complaint, and each and every cause of action therein, fails to state a cause of action or causes of action appropriate for equitable relief against GPM.

### THIRD AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred by the statutes of limitation governing RESPA and Business and Professions Code §17200.

### FOURTH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred, in whole or in part, by waiver, estoppel, release, unclean hands, laches or other equitable doctrines.

### FIFTTH AFFIRMATIVE DEFENSE

Plaintiffs have failed and refused to reduce and mitigate their alleged damages arising from the matters referred to in the Complaint.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs were careless and negligent and at fault in and about the matters complained of, and

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.                                          C 08-01771-RMW-PVT

1  such carelessness, negligence and fault, proximately and concurrently caused the alleged damages

2  sustained by Plaintiffs, and under the principles of comparative fault, Plaintiffs must bear sole or

3

4  partial responsibility for their injuries, damaged, and/or other alleged loss, if any there be, based on

5  the percentage allocation of Plaintiffs' fault or negligence.

6                          **SEVENTH AFFIRMATIVE DEFENSE**

7          Some or all of Plaintiffs' claims are barred, in whole or in part, because Plaintiffs acquiesced

8  in or consented to the acts and omissions alleged in the Complaint, or benefited from the acts or

9

10 omissions, and accepted any and all loan terms and conditions agreed to.

11                          **EIGHTH AFFIRMATIVE DEFENSE**

12         Plaintiffs' Complaint, and each and every cause of action therein, is barred in that Plaintiffs

13 did not justify, or in fact, rely on any representation of GPM.

14                          **NINTH AFFIRMATIVE DEFENSE**

15         Plaintiffs' Complaint, and each and every cause of action therein, is barred in whole or in part

16 in that the damage or damages alleged therein were not proximately caused by the alleged acts,

17

18 omissions or transactions set forth in the Complaint.

19                          **TENTH AFFIRMATIVE DEFENSE**

20         Plaintiffs' Complaint, and each and every cause of action therein, is barred in that at all times

21 GPM acted in good faith.

22                          **ELEVENTH AFFIRMATIVE DEFENSE**

23         Some or all of Plaintiffs' claims are barred, in whole or in part, to the extent they are based

24

25 on the acts or omissions of third parties not under the control of GPM.

26                          **TWELFTH AFFIRMATIVE DEFENSE**

27         Some or all of Plaintiffs' claims are barred, in whole or in part, because GPM has committed

28

-12-

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.                                          C O8-01771-RMW-PVT

no act or omission causing damage to Plaintiffs.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs cannot recover punitive damages to the extent such damages would violate provisions of the United States Constitution, including, but not limited to, the due process clauses of the Fifth and Fourteenth Amendments.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have not suffered any monetary harm, and to the extent to which the may claim to have suffered any monetary harm it was solely as a result of their own actions and choices.

## FIFTEENTH AFFIRMATIVE DEFENSE

Upon information and belief, answering defendant GPM alleges that it presently has insufficient knowledge or information upon which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses available.  Accordingly, answering defendant GPM reserves the right to assert additional affirmative defenses in the event discovery indicates that they would be appropriate.

Wherefore, GPM asks judgment as follows:

1.    That Plaintiffs take nothing by their Complaint or any claim for relief therein;

2.    That the Complaint as against GPM be dismissed with prejudice;

3.    That GPM be awarded its costs and attorney's fees herein; and

4.    For such other and further relief as the Court deems just and proper.

Dated: August 27, 2008            ARLAS & SMITHTON


_____/s/_____
RONALD M. ARLAS, ESQ.
Attorney for Defendant
GREENPOINT MORTGAGE FUNDING, INC.

\Legal\PLEADING\Yu v. Utah Financial,  GPM  #7201\Answer of GPM 8.08.doc

-13-

ANSWER OF DEFENDANT GREENPOINT
MORTGAGE FUNDING, INC.

C O8-01771-RMW-PVT

1   RONALD M. ARLAS, ESQ. #59091
2   ARLAS & SMITHTON
    100 Wood Hollow Drive
3   Novato, CA 94945
    (415) 878-5390
4   Fax (415) 878-3595

5
    EDWARD R. BUELL, ESQ. #240494
6   GREENPOINT MORTGAGE FUNDING, INC.
    100 Wood Hollow Drive
7   Novato, Ca. 94945
    (415) 878-5616
8   Fax (4150 878-3593

9
    Attorneys for Defendant
10  GREENPOINT MORTGAGE FUNDING, INC.

11
              **UNITED STATES DISTRICT COURT**
12
         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
13
                  **(San Jose Division)**

14

15  RICK YU et al.

16              Plaintiffs,              Case No. C O8-01771-RMW-PVT

17              vs.
                                         [Assigned to Magistrate Patricia V. Trumbell]
18  UTAH FINANCIAL, INC., et al.
                Defendants.

19  GREENPOINT MORTGAGE FUNDING,         COUNTERCLAIM OF DEFENDANT
    INC.,                                GREENPOINT MORTGAGE
20                                       FUNDING, INC. FOR FRAUD,
                Counter-claimant         EQUITABLE SUBROGATION AND
21                                       BREACH OF CONTRACT
                vs.
22
    RICK YU; SERLYN YU; and DOES 1
23  through 20, inclusive,

24              Counter-Defendants

25  AND RELATED CROSS-CLAIM

26        COMES NOW counterclaimant GreenPoint Mortgage Funding, Inc. ("GPM"), and alleges as

27  follows:

28

1.      The claims alleged against GPM in the underlying Complaint that was filed by Plaintiff on March 4, 2008 were brought pursuant to federal law, to wit, the Real Estate Settlement Procedures Act ("RESPA") codified at 12 U.S.C. §2601 et seq.   The Court therefore has supplemental Jurisdiction over the state law claims raised in this counterclaim pursuant to 28 U.S.C. §1367.

### GENERAL ALLEGATIONS

2.      Counterclaimant GPM, is a New York corporation, which maintains its principal place of business in Marin County, California.  GPM is licensed by the California Secretary of State to conduct business in California.  GPM was at all times herein relevant a wholesale mortgage banker, which funded and acquired residential mortgage loans, facilitated through independent mortgage brokers, secured by one to four residential dwelling units.  Such loans are then resold to secondary mortgage market investors.  GPM stopped originating new loans in August 2007.

3.      GPM is informed and believes, and on that basis alleges that at all times herein relevant, counter-defendants RICK YU and SERLYN YU ("Plaintiffs" or the "YUS") are and were residents of California residing in Santa Clara County.

4.      GPM is informed and believes, and on that basis alleges that at all times herein relevant, UTAH FINANCIAL, INC. ("UFI") was a Utah corporation that was licensed to conduct business within the State of California.

5.      GPM is informed and believes, and on that basis alleges that at all times herein each counter-defendant was a duly authorized agent and employee of the remaining counter-defendants and were at all times acting within the course and scope of such agency and employment with the permission, knowledge, consent and ratification of each of the remaining counter-defendants.

6.    The true names and capacities, whether individual, corporate, associate or otherwise of counter-defendants Does 1-20, inclusive, are unknown to GPM, and, therefore, GPM sues said counter-defendants by such fictitious names, and GPM will amend this counterclaim to show their true names and/or capacities when the same have been ascertained.  GPM is further informed and believes, and on that basis alleges, that each of the fictitiously named counter-defendants are in some manner responsible for the events and happenings herein referred to and proximately caused the damage suffered by GPM.  For ease of reference, whenever a named counter-defendant is referred to herein, such reference shall be deemed to include Does 1-20.

7.    According to paragraphs 9 and 10 of the Complaint, UFI, through its agents and employees, contacted the YUS in March 2007 regarding a refinance of their current home loans.  At that time the YUS were seeking to refinance both their primary residence, which was located at 8940 Calle Del Rey, Gilroy, California (the "GILROY PROPERTY") as well as their investment property, which was located at 2846 Rainwood Court, San Jose, California (the "SJ PROPERTY").

8.    According to paragraphs 25 and 26 of the Complaint, UFI, and its agents and employess, were the fiduciary agents of the YUS.  UFI, including its agents and employees, were not not and never have been an agent or employee of GPM at any time.

9.    In March of 2007, the YUS submitted a residential loan package to GPM ("GILROY LOAN") for a loan in the principle amount of $608,000.00 (the "GILROY NOTE"), which was secured by a DEED OF TRUST ("DOT") on the GILROY PROPERTY.  True and correct copies of the GILROY NOTE and the GILROY DOT have been attached hereto as Exhibits 1 and 2 respectively.  Also in March 2007, the YUS submitted a residential loan package to GPM ("SJ LOAN") for a loan in the principle amount of $485,000.00 (the "SJ NOTE"), which was secured by a DOT on the SJ PROPERTY.  True and correct copies of the SJ NOTE and the SJ DOT have been

attached hereto as Exhibits 3 and 4 respectively. The GILROY LOAN and the SJ LOAN will hereinafter be collectively referred to as the "YU LOANS".

10.    Based on the information contained in the loan packages submitted to GPM it approved the YU LOANS and funded them on April 23, 2007.

11.    On or about May 17, 2007, GPM sold the GILROY NOTE and the SJ NOTE to an investor ("INVESTOR") on the secondary market. GPM continued to service the GILROY NOTE and the SJ NOTE until the servicing for both the YU LOANS was transferred to GMAC Mortgage Corporation in August 2007. At that time, GPM ceased to have any further ownership or agency interest in the YU LOANS. Therefore, since August 2007 GPM has had no financial or proprietary interest in the GILROY PROPERTY or in the SJ PROPERTY.

**FIRST CAUSE OF ACTION**
**Fraud – GILROY LOAN**
**(Against All Counter-Defendants)**

12.    GPM realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 11 above.

13.    On April 17, 2007, the YUS signed a Residential Loan Application (the " GILROY 1003") for the GILROY LOAN, which was submitted to GPM for funding. A true and correct copy of the GILROY 1003 is attached hereto as Exhibit 5.

14.    By signing the GILROY 1003, the YUS acknowledged in Section IX of said GILROY 1003 that they specifically represent to the Lender, GPM, that:

> "the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in **civil liability, including monetary damages,** to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties . . ." (emphasis added).

---

COUNTERCLAIM OF DEFENDANT
GREENPOINT MORTGAGE FUNDING, INC.                    -4-                    C 08-01771-RMW-PVT

15.    Based on the foregoing acknowledgment, GPM justifiably relied on the information that was contained in the GILROY 1003 in determining whether or not to fund the GILROY LOAN. GPM made its determination to fund the GILROY LOAN based on the information contained in the GILROY 1003 and would not have funded the GILROY LOAN if it had knowledge that the statements contained therein were false and fraudulent.

16.    The GILROY 1003 states that RICK YU earned a monthly income of $16,667.00 as a Police Officer with the San Jose Police Department.   Over a 12 month period, this stated monthly income equates to an annual salary of approximately $200,000. GPM is now informed and believes that the stated income of RICK YU exceeds the monthly income for a San Jose Police Officer. Therefore, GPM is informed and believes that the statements contained in the GILROY 1003 regarding RICK YU's monthly employment earnings were and are false and fraudulent.

17.    Therefore, GPM is informed and believes that the YUS misrepresented the monthly employment income of RICK YU in order to obtain the GILROY LOAN.   Furthermore, GPM is informed and believes that the YUS knew the statements made in the GILROY 1003 were false and fraudulent at the time they signed the GILROY 1003.

18.    Based on the foregoing, GPM is informed and believes that the YUS made the false representations on the GILROY 1003 regarding their monthly income with the intent of inducing GPM to fund the GILROY LOAN. Had GPM known the statements were false and fraudulent, GPM would not have funded the GILROY LOAN.

19.    Based on the fraudulent misrepresenations of the YUS GPM has been damaged in an unknown amount at this time, but probably in the minimum amount of $608,000.00 plus attorney's fees and costs.  GPM may incur additional expenses in an amount unknown to GPM at this time.

1   GPM prays leave of this Court to amend this cross-claim to insert the true amount of the damages

2   when they are ascertained.

3        20.     GPM is informed and believes that in doing the acts herein alleged, the YUS acted

4   with fraud, oppression and malice and GPM is entitled to punitive damages.

5

6                          **SECOND CAUSE OF ACTION**
                              **Fraud – SJ LOAN**
7                        **(Against All Counter-Defendants)**

8        21.     GPM realleges and incorporates herein by reference all of the allegations contained in

9   paragraphs 1 through 11 above.

10       22.     On April 19, 2007, the YUS signed a Residential Loan Application (the "SJ 1003")

11  for the SJ LOAN, which was submitted to GPM for funding.  A true and correct copy of the SJ 1003

12  is attached hereto as Exhibit 6.

13       23.     By signing the SJ 1003, the YUS acknowledged in Section IX of said SJ 1003 that

14  they specifically represent to the Lender, GPM, that:

15               "the information provided in this application is true and correct as
                 of the date set forth opposite my signature and that any intentional or
16               negligent misrepresentation of this information contained in this
                 application may result in **civil liability, including monetary damages**, to
17               any person who may suffer any loss due to reliance upon any
                 misrepresentation that I have made on this application, and/or in criminal
18               penalties . . ." (emphasis added).

19       24.     Based on the foregoing acknowledgment, GPM justifiably relied on the information

20  that was contained in the SJ 1003 in determining whether or not to fund the SJ LOAN.  GPM made

21  its determination to fund the SJ LOAN based on the information contained in the SJ 1003 and would

22  not have funded the SJ LOAN if it had knowledge that the statements contained therein were false

23  and fraudulent.

24

25

26

27

28

---

COUNTERCLAIM OF DEFENDANT                        -6-
GREENPOINT MORTGAGE FUNDING, INC.                          C 08-01771-RMW-PVT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25.     The SJ 1003 states that RICK YU earned a monthly income of $16,667.00 as a Police Officer with the San Jose Police Department.   Over a 12 month period, this stated monthly income equates to an annual salary of approximately $200,000. GPM is now informed and believes that the stated income of RICK YU exceeds the monthly income for a San Jose Police Officer.   Therefore GPM is informed and believes that the statements contained in the SJ 1003 regarding RICK YU's monthly employment earnings were and are false and fraudulent.

26.     Therefore, GPM is informed and believes that the YUS, misrepresented the monthly employment income of RICK YU in order to obtain the SJ LOAN.  Furthermore, GPM is informed and believes that the YUS knew the statements made in the SJ 1003 were false and fraudulent at the time they signed the SJ 1003.

27.     Based on the foregoing, GPM is informed and believes that the YUS made the false representations on the SJ1003 regarding their monthly income with the intent of inducing GPM to fund the SJ LOAN.  Had GPM known the statements were false and fraudulent, GPM would not have funded the SJ LOAN.

28.     Based on the fraudulent misrepresenations of the YUS GPM has been damaged in an unknown amount at this time, but probably in the minimum amount of $485,000.00 plus attorney's fees and costs.  GPM may incur additional expenses in an amount unknown to GPM at this time. GPM prays leave of this Court to amend this cross-claim to insert the true amount of the damages when they are ascertained.

29.     GPM is informed and believes that in doing the acts herein alleged, the YUS acted with fraud, oppression and malice and GPM is entitled to punitive damages.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD CAUSE OF ACTION**
**Equitable Subrogation – GILROY LOAN**
**(Against All Counter-Defendants)**

30.     GPM realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 11, above.

31.     Pursuant to the GILROY LOAN, funds were to be used to pay-off pre-existing debt that had been incurred by the YUS.   The approximate amount of the pre-existing debt was $604,125.75.     The disbursal schedule is laid out in the U.S. Department of Housing and Urban Development Settlement Statement for the GILROY LOAN (the "GILROY HUD-1"), which shows that $507,944.24 was paid to Virtual Bank, $60,468.59 was paid to Wells Fargo Bank, and $35,712.92 was paid to Wells Fargo Bank.  A true and correct copy of the GILROY HUD-1 has been attached hereto as Exhibit 7.  Furthermore, pursuant to the GILROY LOAN, and as indicated on line 303 of the GILROY HUD-1, the YUS received $625.53 in cash proceeds from the funding of the GILROY LOAN.

32.     In April of 2007 the YUS entered into a contract with GPM in the form of the GILROY NOTE and GILROY DOT.  Pursuant to the terms of the GILROY NOTE, GPM funded the GILROY LOAN in the amount of $608,000.00 to be secured by the GILROY DOT on the GILROY PROPERTY.

33.     It would be inequitable that GPM should bear the full loss of $608,000.00 while $604,751.28 of the GILROY LOAN was received by the YUS for their benefit either as cash or to pay-off pre-existing real estate debt incurred by the YUS.  Therefore, the YUS have been unjustly enriched by the amount of the GILROY LOAN that was used solely for their benefit.  Therefore, by reason of the payment of the amount of $604,751.28 by GPM for the sole benefit of the YUS, GPM and its successors in interest became entitled to enforce the right to reimbursement for pay-off of the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

pre-existing debt of the YUS and the cash proceeds received by the YUS from the proceeds of the GILROY LOAN.  GPM is entitled to interest at the legal rate on the pay-off amount of $604,751.28 from April 23, 2007.

**FOURTH CAUSE OF ACTION**
**Equitable Subrogation – SJ LOAN**
**(Against All Counter-Defendants)**

34.    GPM realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 11, above.

35.    Pursuant to the SJ LOAN, funds were to be used to pay-off pre-existing debt that had been incurred by the YUS. The approximate amount of the pre-existing debt was $477,417.75.  The disbursal schedule is laid out in the U.S. Department of Housing and Urban Development Settlement Statement for the SJ LOAN (the "SJ HUD-1"), which shows that $433,500.20 was paid to Wachovia, and $43,917.55 was paid to Citimortgage.  A true and correct copy of the SJ HUD-1 has been attached hereto as Exhibit 8.  Furthermore, pursuant to the SJ LOAN, and as indicated on line 303 of the SJ HUD-1, the YUS received $2,992.17 in cash proceeds from the funding of the SJ LOAN.

36.    In April of 2007 the YUS entered into a contract with GPM in the form of the SJ NOTE and SJ DOT.  Pursuant to the terms of the SJ NOTE, GPM funded the SJ LOAN in the amount of $485,000.00 to be secured by the SJ DOT on the SJ PROPERTY.

37.    It would be inequitable that GPM should bear the full loss of $485,000.00 while $480,409.92 of the SJ LOAN was received by the YUS for their benefit either as cash or to pay-off pre-existing real estate debt incurred by the YUS. Therefore, the YUS have been unjustly enriched by the amount of the SJ LOAN that was used solely for their benefit. Therefore, by reason of the payment of the amount of $480,409.92 by GPM for the sole benefit of the YUS, GPM and its

successors in interest became entitled to enforce the right to reimbursement for pay-off of the pre-existing debt of the YUS and the cash proceeds received by the YUS from the proceeds of the SJ LOAN. GPM is entitled to interest at the legal rate on the pay-off amount of $480,409.92 from April 23, 2007.

### FIFTH CAUSE OF ACTION
#### Breach of Contract – GILROY LOAN
#### (Against All Counter-Defendants)

38.     GPM realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 11, and 13 through 19 above.

39.     On April 16, 2007, GPM and the YUS entered into a valid written contract in the form of the GILROY NOTE, which in paragraph 11 of said GILROY NOTE incorporates the GILROY DOT, copies of which are attached hereto as Exhibits 1 and 2 respectively.

40.     GPM performed all of the conditions, covenants, and promises required of GPM under the GILROY NOTE and the incorporated GILROY DOT by funding the GILROY LOAN.

41.     Section 8 of the GILROY DOT states that a "Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the loan."

42.     As stated in paragraph 16 above, GPM is informed and believes that the YUS breached the terms of the GILROY DOT by submitting a loan application (the GILROY 1003) which contained materially false, misleading, or inaccurate information.

43.     GPM as been damaged in an amount that is unknown at this time as a result of the breach by the YUS which resulted in GPM funding the GILROY LOAN. Said damages are include

but are not limited to the main action brought by the YUS against GPM and the attorney's fees and costs incurred therein.

### SIXTH CAUSE OF ACTION
### Breach of Contract – SJ LOAN
### (Against All Counter-Defendants)

44.    GPM realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 11, and 22 through 28 above.

45.    On April 16, 2007, GPM and the YUS entered into a valid written contract in the form of the SJ NOTE, which in paragraph 11 of said SJ NOTE incorporates the SJ DOT, copies of which are attached hereto as Exhibits 3 and 4 respectively.

46.    GPM performed all of the conditions, covenants, and promises required of GPM under the SJ NOTE and the incorporated SJ DOT by funding the SJ LOAN.

47.    Section 8 of the SJ DOT states that a "Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the loan."

48.    As stated in paragraph 25 above, GPM is informed and believes that the YUS breached the terms of the SJ DOT by submitting a loan application (the SJ 1003) which contained materially false, misleading, or inaccurate information.

49.    GPM as been damaged in an amount that is unknown at this time as a result of the breach by the YUS which resulted in GPM funding the SJ LOAN.  Said damages are include but are not limited to the main action brought by the YUS against GPM and the attorney's fees and costs incurred therein.

COUNTERCLAIM OF DEFENDANT
GREENPOINT MORTGAGE FUNDING, INC.                    -11-                    C O8-01771-RMW-PVT

1    WHEREFORE, GPM prays for judgment against counter-defendants, and each of them,

2    jointly and severally, as follows:

3        1.  Fraud damages in an amount of no less than the total debt owed on the GILROY

4    LOAN, or according to proof;

5        2.  Fraud damages in an amount of no less than the total debt owed on the SJ LOAN, or

6    

7    according to proof;

8        3.  Punitive Damages against the YUS;

9        4.  An order granting GPM $604,751.28 plus interest at the legal rate from the GILROY

10   LOAN as a set-off against any judgment entered against GPM;

11   

12       5.  An order granting GPM $480,409.92 plus interest at the legal rate from the SJ LOAN

13   as a set-off against any judgment entered against GPM;

14       6.  Breach of contract damages in an amount of no less than the total debt owed on the

15   GILROY LOAN, or according to proof;

16       7.  Breach of contract damages in an amount of no less than the total debt the minimum

17   amount of the SJ LOAN, or according to proof;

18   

19       8.  For reasonable attorney's fees and costs;

20       9.  For costs of the suit herein incurred; and

21       10. For such other and further relief the court may deem proper.

22   Dated: August 27, 2008                         .      /s/ Ronald M. Arlas                    .
                                                    RONALD M. ARLAS, ESQ.
23                                                  EDWARD R. BUELL III, ESQ.
24                                                  Attorney for Defendant and Cross-Complainant
                                                    GREENPOINT MORTGAGE FUNDING, INC.
25   

26   \Legal\PLEADING\Yu v. Utah Financial;  GPM  #7201\Counterclaim of GPM 8.08.doc

27   

28   

---

COUNTERCLAIM OF DEFENDANT                    -12-
GREENPOINT MORTGAGE FUNDING, INC.                                C O8-01771-RMW-PVT

# EXHIBIT 1

We hereby certify this to be a true copy of the original FIRST AMERICAN TITLE COMPANY By

# ADJUSTABLE RATE NOTE

## Monthly Treasury Average Index - Payment and Rate Caps

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN $668,800.00. THE INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| April 16, 2007 | San Jose | Utah |
|---|---|---|
| [Date] | [City] | [State] |

8940 CALLE DEL REY, Gilroy, CA  95020

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 608,000.00                    (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **GreenPoint Mortgage Funding, Inc.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of                    **1.000** %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of June, 2007                    , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

### (C) Interest Rate Limit

My interest rate will never be greater than                    **12.000**%.

### (D) Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **three and one-half** percentage points ( **3.500** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

0092139369

VMP-829 N (0005)
VMP MORTGAGE FORMS - (800)521-7291
Customized by GreenPoint Mortgage Funding, Inc.

OPTNCA-OA (03/07)

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on June 1, 2007 . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 79363, City of Industry, CA 91716-9363

or

at a different place if required by the Note Holder.

#### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,955.57 . This amount may change.

#### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of June, 2008 " , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

#### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last monthly payment due before the Payment Change Date.

#### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

#### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to 110% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

#### (G) Required Full Payment

On 06/01/2012 and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

0092139369

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        **6.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

0092139369




Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0092139369



WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
RICK YU                 -Borrower

_____ (Seal)
SERLYN YU               -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

*[Sign Original Only]*

0092139369

OPTNCA-OA (06/06)  GreenPoint Mortgage Funding, Inc.
Page 5 of 5

# EXHIBIT 2

Recording Requested By
First American Title
Escrow No. 4311-2746910-
                    3286894/LA

Recording Requested By:
**GreenPoint Mortgage Funding, Inc.**
Return To:
**GreenPoint Mortgage Funding, Inc.**
**981 Airway Court, Suite E**
**Santa Rosa, CA 95403-2049**

Prepared By:
**GreenPoint Mortgage Funding, Inc.**
**100 Wood Hollow Drive, Novato, CA 94945**

| DOCUMENT: 19397315 | | Pages: 25 |
|---|---|---|
| | Fees.... | 81.00 |
| | Taxes... | |
| | Copies.. | |
| | AMT PAID | 81.00 |

REGINA ALCOMENDRAS          RDE # 014
SANTA CLARA COUNTY RECORDER   4/24/2007
Recorded at the request of    8:00 AM
First American Title Company

————————————[Space Above This Line For Recording Data]————————————

# DEED OF TRUST

MIN 100013800921393696

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **April 16, 2007**
together with all Riders to this document.
**(B) "Borrower"** is **RICK  YU  and SERLYN  YU, Husband And Wife, As Joint Tenants**

Borrower's address is, **8940 CALLE DEL REY, Gilroy, CA 95020**
. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **GreenPoint Mortgage Funding, Inc.**

Lender is a **Corporation**
organized and existing under the laws of **the State of New York**

9369

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005 1/01

VMP -6A(CA) (0207).01
®
Page 1 of 15
          VMP Mortgage Forms, Inc.
Customized by GreenPoint Mortgage Funding, Inc.

Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**

(D) "Trustee" is **Marin Conveyancing Corp.**

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated **April 16, 2007**
The Note states that Borrower owes Lender **six hundred eight thousand and 00/100**

Dollars

(U.S. **$608,000.00**                    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2037**

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |
| ☒ Occupancy Rider | ☒ Interim Interest Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

9369

**-6A(CA)** (0207).01                    Page 2 of 15                    Form 3006  1/01

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
County      of      Santa Clara      :
    [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
LOT 11, MAP OF TRACT NO. 9162 "SCHRAMM PROPERTY", FILED SEPTEMBER 09, 1999, MAP BOOK 718, PAGE 53-55, SANTA CLARA COUNTY RECORDS.

Parcel ID Number: 783-35-085                which currently has the address of
8940 CALLE DEL REY                                          [Street]
Gilroy                          [City], California 95020      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

9369

 -6A(CA) (0207).01              Page 3 of 15              Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

9369

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

9369

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

9369

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

9369

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

9369

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

9369

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

   13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

   Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

   14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

   If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

   15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

9369

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

9369

-6A(CA) (0207).01                    Page 11 of 15                    Form 3005  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

9369

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

9369

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                            RICK YU                    -Borrower

_____          _____ (Seal)
                                            SERLYN YU                  -Borrower

_____ (Seal)        _____ (Seal)
                     -Borrower                                         -Borrower

_____ (Seal)        _____ (Seal)
                     -Borrower                                         -Borrower

_____ (Seal)        _____ (Seal)
                     -Borrower                                         -Borrower

9369

-6A(CA) (0207).01                Page 14 of 15              Form 3005  1/01

State of California
County of *Santa Clara*

On   *4.17.07*   before me,  *Lupe Winans, Notary Public*

personally appeared

RICK YU, SERLYN YU

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

LUPE WINANS
Commission # 1425764
Notary Public - California
Santa Clara County
My Comm. Expires Jun 21, 2007

9369

-6A(CA) (0207).01          Page 15 of 15          Form 3006   1/01

Order No.: 3286841c
Reference No.: YU
Escrow Officer: NICO MENDOZA
Escrow Number: 2746910

## DESCRIPTION

All that certain land situated in the State of California, County of **SANTA CLARA,** City of **GILROY,** described as follows:

**LOT 11, MAP OF TRACT NO. 9162 "SCHRAMM PROPERTY", FILED SEPTEMBER 09, 1999, MAP BOOK 718, PAGE 53-55, SANTA CLARA COUNTY RECORDS.**

APN No: **783-35-085-00**

# EXHIBIT 3

WE HEREBY CERTIFY THIS TO BE A
TRUE COPY OF THE ORIGINAL.
FIRST AMERICAN TITLE COMPANY.
BY_____

# ADJUSTABLE RATE NOTE
### Monthly Treasury Average Index - Payment and Rate Caps

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN $533,500.00. THE INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| April 19, 2007 | San Jose | California |
|---|---|---|
| [Date] | [City] | [State] |

2846 Rainwood Court, San Jose, CA  95148

[Property Address]

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 485,000.00        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GreenPoint Mortgage Funding, Inc.

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
### (A) Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        2.000 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of June, 2007        , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

### (C) Interest Rate Limit
My interest rate will never be greater than        12.000%.

### (D) Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").
The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
### (E) Calculation of Interest Rate Changes
Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding three and one-half percentage points ( 3.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

0092139302

-829N (0005)
VMP MORTGAGE FORMS - (800)521-7291
Customized by GreenPoint Mortgage Funding, Inc.

OPTNCA-OA (03/07)

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on June 1, 2007 . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 79363, City of Industry, CA 91716-9363

or

at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,792.65 This amount may change.

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of June, 2008 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last monthly payment due before the Payment Change Date.

### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to 110% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

### (G) Required Full Payment

On 06/01/2012 and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

0092139302



## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          6.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

0092139302

 

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0092139302

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
RICK YU                          -Borrower

_____ (Seal)
SERLYN L. YU                     -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

*[Sign Original Only]*

0092139302

OPTNOA-OA (06/06) GreenPoint Mortgage Funding, Inc.
Page 5 of 5

# EXHIBIT 4

Recording Requested By
First American Title
Escrow No. *4311 - 2146889*    *3286838-VR*

Recording Requested By:
**GreenPoint Mortgage Funding, Inc.**
Return To:
**GreenPoint Mortgage Funding, Inc.**
**981 Airway Court, Suite E**
**Santa Rosa, CA 95403-2049**

Prepared By:
**GreenPoint Mortgage Funding, Inc.**
**100 Wood Hollow Drive, Novato, CA 94945**

**DOCUMENT: 19397311**

Pages: 26

Fees.... 84.00
Taxes...
Copies..
AMT PAID 84.00

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
First American Title Company

RDE # 014
4/24/2007
8:00 AM

─────────────|Space Above This Line For Recording Data|─────────────

# DEED OF TRUST

MIN 100013800921393027

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **April 19, 2007**
together with all Riders to this document.
**(B) "Borrower"** is **RICK YU and SERLYN L. YU, Husband And Wife**

Borrower's address is **8940 CALLE DEL REY, Gilroy, CA 95020**
. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **GreenPoint Mortgage Funding, Inc.**

Lender is a **Corporation**
organized and existing under the laws of **the State of New York**

9302

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3005 1/01

VMP -6A(CA) (0207).01
Page 1 of 15

VMP Mortgage Forms, Inc.
Customized by GreenPoint Mortgage Funding, Inc.

Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**

**(D) "Trustee"** is **Marin Conveyancing Corp.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **April 19, 2007**
The Note states that Borrower owes Lender **four hundred eighty-five thousand and 00/100**                                                                                                  Dollars
(U.S. $ **485,000.00**            ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2037**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [x] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [ ] Occupancy Rider | [x] Interim Interest Rider | |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

9302

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | Santa Clara | : |

[Type of Recording Jurisdiction]             [Name of Recording Jurisdiction]

**LOT 59, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "TRACT NO. 6474", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, ON MAY 1, 1979 IN BOOK 440 OF MAPS PAGE 45.**

Parcel ID Number: **654-50-067**          which currently has the address of
**2846 Rainwood Court**          [Street]
**San Jose**          [City], **California 95148**    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

9302

 -6A(CA) (0207).01          Page 3 of 15          Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

**9302**

-6A(CA) (0207).01                    Page 4 of 15                    Form 3005  1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

9302

 -6A(CA) (0207).01                  Page 5 of 15                  Form 3006  1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

9302

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

9302

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

9302



to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

9302

-6A(CA) (0207).01                    Page 10 of 15                    Form 3006  1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

9302

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

9302



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____    (Seal)
RICK YU                             -Borrower

                                    (Seal)
SERLYN L. YU                        -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                          -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                          -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                          -Borrower

State of California
County of  Santa Clara                        } ss.

On  4.19.07          before me, Lupe Winans, Notary Public
                                                       personally appeared

RICK YU, SERLYN L. YU


                                                        , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

                                                      _____ (Seal)

```
LUPE WINANS
Commission # 1425764
Notary Public - California
Santa Clara County
My Comm. Expires Jun 21, 2007
```

# EXHIBIT 5

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when [X] the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or [ ] the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower

Co-Borrower

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | [ ] VA [X] Conventional [ ] Other (explain): ALT A [ ] FHA [ ] USDA/Rural Housing Service | Agency Case Number | Lender Case Number 0092139369 |
|---|---|---|---|
| Amount $ 608,000.00 | Interest Rate 1.000 % | No. of Months 360 | Amortization Type: [ ] Fixed Rate [ ] Other (explain): [ ] GPM [X] ARM (type): ALT A AP_1MO/1YR TRE |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

Subject Property Address (street, city, state & ZIP)   No. of Units
8940 CALLE DEL REY, Gilroy, CA 95020    1

Legal Description of Subject Property (attach description if necessary) LOT 11, MAP OF TRACT NO. 9162 "SCHRAMM PROPERTY",   Year Built
FILED SEPTEMBER 09, 1999, MAP BOOK 718, PAGE 53-55, SANTA CLARA COUNTY RECORDS.   2000

| Purpose of Loan [ ] Purchase [ ] Construction [X] Refinance [ ] Construction-Permanent [ ] Other (explain): | Property will be: [X] Primary Residence [ ] Secondary Residence [ ] Investment |
|---|---|

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

Complete this line if this is a refinance loan.

| Year Acquired 2000 | Original Cost $ 459,000.00 | Amount Existing Liens $ 645,000.00 | Purpose of Refinance Lmtd Cash-Out Rate/Term | Describe Improvements [ ] made [ ] to be made Cost: $0.00 |
|---|---|---|---|---|

Title will be held in what Name(s) RICK YU, SERLYN L YU .

Manner in which Title will be held  Joint Tenants

Estate will be held in: [X] Fee Simple [ ] Leasehold (show expiration date)

Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain)

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name (include Jr. or Sr. if applicable) | RICK YU | SERLYN YU |
| Social Security Number | 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 | 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 |
| Home Phone (incl. area code) | (408) 497-2812 | (408) 497-2812 |
| DOB (mm/dd/yyyy) | 06/08/1966 | 06/15/1965 |
| Yrs. School | 18 | 18 |

[X] Married (include registered domestic partners) [ ] Separated  Dependents (not listed by Co-Borrower) no. 0 ages
[X] Married (include registered domestic partners) [ ] Separated  Dependents (not listed by Borrower) no. 0 ages
[ ] Unmarried (include single, divorced, widow ed)

| Present Address (street, city, state, ZIP) [X] Own [ ] Rent No. Yrs. 6 | Present Address (street, city, state, ZIP) [X] Own [ ] Rent No. Yrs. 6 |
|---|---|
| 8940 CALLE DEL REY Gilroy, CA 95020 | 8940 CALLE DEL REY Gilroy, CA 95020 |
| Mailing Address, if different from Present Address 8940 CALLE DEL REY Gilroy, CA 95020 | Mailing Address, if different from Present Address |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name & Address of Employer | SAN JOSE POLICE DEPT 200 EAST SANTA CLARA STREET San Jose, CA 95112 | [ ] Self Employed |
| Yrs. on this job | 17.25 | |
| Yrs. employed in this line of work/profession | 17 | |
| Position/Title/Type of Business | POLICE OFFICER | |
| Business Phone (incl. area code) | (408) 277-4631 | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer [ ] Self Employed | Dates (from - to) Monthly Income $ | Name & Address of Employer [ ] Self Employed | Dates (from - to) Monthly Income $ |
|---|---|---|---|
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name & Address of Employer [ ] Self Employed | Dates (from - to) Monthly Income $ | Name & Address of Employer [ ] Self Employed | Dates (from - to) Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

0092139369
Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
Wolters Kluwer Financial Services
VMP®-21N(CA) (0512).02
Page 1 of 4

## MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 16,667.00 | $ 0.00 | $ 16,667.00 | Rent | $ 0.00 | |
| Overtime | 0.00 | 0.00 | 0.00 | First Mortgage (P&I) | 1,755.00 | $ 1,955.57 |
| Bonuses | 0.00 | 0.00 | 0.00 | Other Financing (P&I) | 317.00 | 0.00 |
| Commissions | 0.00 | 0.00 | 0.00 | Hazard Insurance | 55.00 | 55.00 |
| Dividends/Interest | 0.00 | 0.00 | 0.00 | Real Estate Taxes | 616.96 | 616.96 |
| Net Rental Income | 0.00 | 0.00 | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 16,667.00 | $ 0.00 | $ 16,667.00 | Total | $ 2,743.96 | 2,627.53 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income    Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B)
or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed ☐ Jointly ☒ Not Jointly

| ASSETS Description | Cash or Market Value | LIABILITIES. Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| | | *** SEE ADDENDUM *** | | |
| List checking and savings accounts below | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| ING | | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | $ 107,523.00 | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. 118920-1 | $ 3,860.00 | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. 118920-2 | $ 222.03 | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. 118920-22 | $ 3,659.74 | | | |
| Stocks & Bonds (Company name/number & description) | $ | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value | $ 0.00 | | | |
| Face amount: $ 0.00 | | | | |
| Subtotal Liquid Assets | $ 115,264.77 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 2,025,000.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 89,692.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. | | |
| Other Assets (itemize) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| | | Job-Related Expense (child care, union dues, etc.) Neg. Rent | $ 1,012.26 | |
| | | Total Monthly Payments | $ 1,209.26 | |
| Total Assets a. | $ 2,229,956.77 | Net Worth (a minus b) $ 2,221,242.77 | Total Liabilities b. | $ 8,714.00 |

## VI. ASSETS AND LIABILITIES (cont'd)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 131 NORTH PHEASANT RD #2058 | R / SFR | $ 400000 | $ 131896 | $ 2500 | $ 663 | $ 0 | $ 1212 |
| 2846 RAINWOOD CT | R / SFR | 750000 | 482000 | 2050 | 3207 | 555 | -2224 |
| 8940 CALLE DEL REY Gilroy, CA, 95020 | H / SFR | 875000 | 604500 | 0 | 2278 | 0 | 0 |
| | Totals $ | $ 2025000 | $ 1218396 | $ 4550 | $ 6148 | $ 555 | $ -1012 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 0.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | 0.00 |
| d. Refinance (incl. debts to be paid off) | 604,500.00 |
| e. Estimated prepaid items | 90.63 |
| f. Estimated closing costs | 3,118.00 |
| g. PMI, MIP, Funding Fee | 0.00 |
| h. Discount (if Borrower will pay) | 0.00 |
| i. Total costs (add items a through h) | 607,708.63 |
| j. Subordinate financing | 0.00 |
| k. Borrower's closing costs paid by Seller | 0.00 |
| l. Other Credits (explain) | 0.00 / 0.00 / 0.00 / 0.00 / 0.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 608,000.00 |
| n. PMI, MIP, Funding Fee financed | 0.00 |
| o. Loan amount (add m & n) | 608,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -291.37 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes / No | Co-Borrower Yes / No |
|---|---|---|
| a. Are there any outstanding judgments against you? | No:x | No:x |
| b. Have you been declared bankrupt within the past 7 years? | No:x | No:x |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | No:x | No:x |
| d. Are you a party to a lawsuit? | No:x | No:x |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | No:x | No:x |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | No:x | No:x |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | No:x | No:x |
| h. Is any part of the down payment borrowed? | No:x | No:x |
| i. Are you a co-maker or endorser on a note? | No:x | No:x |
| j. Are you a U.S. citizen? | Yes:x | Yes:x |
| k. Are you a permanent resident alien? | No:x | No:x |
| l. Do you intend to occupy the property as your primary residence? | Yes:x | Yes:x |
| m. Have you had an ownership interest in a property in the last three years? | Yes:x | |

(1) What type of property did you own – principal residence (PR), second home (SH), or investment property (IP)? — PR / PR
(2) How did you hold title to the home – solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? — SP / SP

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (9) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (10) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state law (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature X | Date 4/17/07 | Co-Borrower's Signature X | Date 4-17-07 |
|---|---|---|---|

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER [x] I do not wish to furnish this information. | CO-BORROWER [x] I do not wish to furnish this information. |
|---|---|
| **Ethnicity:** Hispanic or Latino / Not Hispanic or Latino | **Ethnicity:** Hispanic or Latino / Not Hispanic or Latino |
| **Race:** American Indian or Alaska Native / Asian / Black or African American / Native Hawaiian or Other Pacific Islander / White | **Race:** American Indian or Alaska Native / Asian / Black or African American / Native Hawaiian or Other Pacific Islander / White |
| **Sex:** Female / Male | **Sex:** Female / Male |

| To be Completed by Interviewer This application was taken by: | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| ☐ Face-to-face interview | Interviewer's Signature | Utah Financial, Inc |
| ☐ Mail | Date 04/04/2007 | 4001 South 700 East #100 |
| [x] Telephone | Interviewer's Phone Number (incl. area code) | Salt Lake City, UT 84107 |
| ☐ Internet | (801) 269-2400 | |

VMP®-21N(CA) (0512).02  Page 3 of 4  0092139369

Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05

| CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION | | |
|---|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>RICK YU | Agency Case Number: |
| | Co-Borrower:<br>SERLYN YU | Lender Case Number:<br>0092139369 |

Under California Civil Code 1812.30 (j) "Credit applications for the obtainment of money, goods, labor, or services shall clearly specify that the applicant, if married, may apply for a separate account."

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | 4-17-07 | X | 4-17-07 |

0092139369
Freddie Mac Form 85 7/05
Fannie Mae Form 1003 7/05
VMP®-21N(CA) (0512).02

Page 4 of 4

Addendum for Loan # : 0092139369 - RICK .YU and SERLYN  YU

--- LIABILITIES ---

| Creditor | :VIRTUALBANK | Acct. # | : 9000007115 |
|---|---|---|---|
| Address | :8940 CALLE DEL REY | Balance | : [$510,000.00] |
| | | Payment | : [$1,735.00] |
| C/S/Z | : | Rem. Term : | 291 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| Creditor | :WACHOVIA MORTGAGE CORP | Acct. # | : 5260007555886 |
|---|---|---|---|
| Address | :PAYING OFF, NEW GPM | Balance | : [$432,000.00] |
| | | Payment | : [$1,755.00] |
| C/S/Z | : | Rem. Term : | 247 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| Creditor | :NATIONAL CITY MORTGAGE | Acct. # | : 4330003792723 |
|---|---|---|---|
| Address | :131 NORTH PHEASANT RD #2058 | Balance | : [$131,896.00] |
| | | Payment | : [$663.00] |
| C/S/Z | : | Rem. Term : | 199 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| Creditor | :WELLS FARGO BANK N A | Acct. # | : 65165179190261998 |
|---|---|---|---|
| Address | :8940 CALLE DEL REY | Balance | : [$59,250.00] |
| | | Payment | : [$339.00] |
| C/S/Z | : | Rem. Term : | 175 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| Creditor | :CITIBANKNA | Acct. # | : 5008169220299466 |
|---|---|---|---|
| Address | :PAYING OFF, NEW GPM | Balance | : [$42,701.00] |
| | | Payment | : [$317.00] |
| C/S/Z | : | Rem. Term : | 135 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| Creditor | :WELLS FARGO BANK N A | Acct. # | : 65165179192471998 |
|---|---|---|---|
| Address | :8940 CALLE DEL REY | Balance | : [$35,250.00] |
| | | Payment | : [$204.00] |
| C/S/Z | : | Rem. Term : | 173 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| Creditor | :CHASE | Acct. # | : 4388540011725669 |
|---|---|---|---|
| Address | : | Balance | : $7,851.00 |
| | | Payment | : $157.00 |
| C/S/Z | : | Rem. Term : | 51 |
| Acct. Type | :Revolving | | |
| In Name Of | :RICK  YU | | |

| Creditor | :AMEX | Acct. # | : 050691114012340192 |
|---|---|---|---|
| Address | : | Balance | : $863.00 |
| | | Payment | : $40.00 |
| C/S/Z | : | Rem. Term : | 22 |
| Acct. Type | :Revolving | | |
| In Name Of | :RICK  YU | | |

| Creditor | :GREENPOINT MTG | Acct. # | : 0092139302 |
|---|---|---|---|
| Address | : | Balance | : [$482,000.00] |
| | | Payment | : [$3,761.76] |
| C/S/Z | : | Rem. Term : | 129 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU and SERLYN  YU | | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date: | Co-Borrower's Signature: | Date: |
|---|---|---|---|
| X | | X | |

Addendum for Loan # : 0092139369 - RICK  YU and SERLYN  YU

--- LIABILITIES ---

```
Creditor    :VIRTUALBANK            Acct. #   : 9000007115
Address     :8940 CALLE DEL REY     Balance   : [$510,000.00]
                                    Payment   : [$1,735.00]
C/S/Z       :                       Rem. Term :    291
Acct. Type  :Mortgage
In Name Of  :RICK  YU

Creditor    :WACHOVIA MORTGAGE CORP Acct. #   : 5260007555886
Address     :PAYING OFF, NEW GPM    Balance   : [$432,000.00]
                                    Payment   : [$1,755.00]
C/S/Z       :                       Rem. Term :    247
Acct. Type  :Mortgage
In Name Of  :RICK  YU

Creditor    :NATIONAL CITY MORTGAGE Acct. #   : 4330003792723
Address     :131 NORTH PHEASANT RD #2058  Balance : [$131,896.00]
                                    Payment   : [$663.00]
C/S/Z       :                       Rem. Term :    199
Acct. Type  :Mortgage
In Name Of  :RICK  YU

Creditor    :WELLS FARGO BANK N A   Acct. #   : 65165179190261998
Address     :8940 CALLE DEL REY     Balance   : [$59,250.00]
                                    Payment   : [$339.00]
C/S/Z       :                       Rem. Term :    175
Acct. Type  :Mortgage
In Name Of  :RICK  YU

Creditor    :CITIBANKNA             Acct. #   : 5008169220299466
Address     :PAYING OFF, NEW GPM    Balance   : [$42,701.00]
                                    Payment   : [$317.00]
C/S/Z       :                       Rem. Term :    135
Acct. Type  :Mortgage
In Name Of  :RICK  YU

Creditor    :WELLS FARGO BANK N A   Acct. #   : 65165179192471998
Address     :8940 CALLE DEL REY     Balance   : [$35,250.00]
                                    Payment   : [$204.00]
C/S/Z       :                       Rem. Term :    173
Acct. Type  :Mortgage
In Name Of  :RICK  YU

Creditor    :CHASE                  Acct. #   : 4388540011725669
Address     :                       Balance   : $7,851.00
                                    Payment   : $157.00
C/S/Z       :                       Rem. Term :     51
Acct. Type  :Revolving
In Name Of  :RICK  YU

Creditor    :AMEX                   Acct. #   : 050691114012340192
Address     :                       Balance   : $863.00
                                    Payment   : $40.00
C/S/Z       :                       Rem. Term :     22
Acct. Type  :Revolving
In Name Of  :RICK  YU

Creditor    :GREENPOINT MTG         Acct. #   : 0092139302
Address     :                       Balance   : [$482,000.00]
                                    Payment   : [$3,761.76]
C/S/Z       :                       Rem. Term :    129
Acct. Type  :Mortgage
In Name Of  :RICK  YU and SERLYN  YU
```

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date: | Co-Borrower's Signature: | Date: |
|---|---|---|---|
| X | 4-17-07 | X | 4-17-07 |

# EXHIBIT 6

## Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when [X] the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or [ ] the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower _____

Co-Borrower _____

### TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | VA [ ] | [x] Conventional | [ ] Other (explain): ALT A | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|
| | FHA [ ] | [ ] USDA/Rural Housing Service | | | 0092139302 |

| Amount | Interest Rate | No. of Months | Amortization Type: | [ ] Fixed Rate | [ ] Other (explain): |
|---|---|---|---|---|---|
| $ 485,000.00 | 2.000 % | 360 | | [ ] GPM | [x] ARM (type): ALT A AP 1MO/1YR TRE |

### PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) | No. of Units |
|---|---|
| 2846 Rainwood Court, San Jose, CA  95148 | 1 |

| Legal Description of Subject Property (attach description if necessary) LOT 59, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "TRACT NO. 6474", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA | Year Built |
|---|---|
| | 1979 |

| Purpose of Loan | [ ] Purchase | [ ] Construction | [ ] Other (explain): | Property will be: |
|---|---|---|---|---|
| | [x] Refinance | [ ] Construction-Permanent | | [ ] Primary Residence  [ ] Secondary Residence  [x] Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | Cost: $0.00 |
|---|---|---|---|---|---|
| 1992 | $ 340,000.00 | $ 470,000.00 | Lmtd Cash-Out Rate/Term | [ ] made  [ ] to be made | |

| Title will be held in what Name(s) RICK YU, SERLYN L YU | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| | Joint Tenants | [x] Fee Simple  [ ] Leasehold (show expiration date) |

Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain)

### BORROWER INFORMATION / CO-BORROWER INFORMATION

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|
| RICK  YU | SERLYN L. YU |

| Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|
| 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 | (408) 497-2812 | 06/08/1966 | 19 | 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 | (408) 497-2812 | 06/15/1965 | 18 |

| [x] Married (include registered domestic partners)  [ ] Separated  [ ] Unmarried (include single, divorced, widowed) | Dependents (not listed by Co-Borrower) no. 0  ages | [x] Married (include registered domestic partners)  [ ] Separated  [ ] Unmarried (include single, divorced, widowed) | Dependents (not listed by Borrower) no. 0  ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) [x] Own [ ] Rent 6 No. Yrs. | Present Address (street, city, state, ZIP) [x] Own [ ] Rent 6 No. Yrs. |
|---|---|
| 8940 CALLE DEL REY | 8940 CALLE DEL REY |
| Gilroy, CA 95020 | Gilroy, CA 95020 |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|
| 8940 CALLE DEL REY | |
| Gilroy, CA 95020 | |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) [ ] Own [ ] Rent ___ No. Yrs. | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent ___ No. Yrs. |
|---|---|

### EMPLOYMENT INFORMATION

| Name & Address of Employer | [ ] Self Employed | Yrs. on this job | Name & Address of Employer | [ ] Self Employed | Yrs. on this job |
|---|---|---|---|---|---|
| SAN JOSE POLICE DEPT | | 17.25 | | | |
| 200 EAST SANTA CLARA STREET | | Yrs. employed in this line of work/profession | | | Yrs. employed in this line of work/profession |
| San Jose, CA 95112 | | 17 | | | |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| POLICE OFFICER | (408) 277-4631 | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer | [ ] Self Employed | Dates (from - to) | Name & Address of Employer | [ ] Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer | [ ] Self Employed | Dates (from - to) | Name & Address of Employer | [ ] Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

0092139302
Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
Wolters Kluwer Financial Services
VMP®-21N(CA) (0612).02
Page 1 of 4



## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 16,667.00 | $ 0.00 | $ 16,667.00 | Rent | $ 0.00 | |
| Overtime | 0.00 | 0.00 | 0.00 | First Mortgage (P&I) | 3,263.88 | $ 1,792.65 |
| Bonuses | 0.00 | 0.00 | 0.00 | Other Financing (P&I) | 0.00 | 0.00 |
| Commissions | 0.00 | 0.00 | 0.00 | Hazard Insurance | 55.00 | 55.00 |
| Dividends/Interest | 0.00 | 0.00 | 0.00 | Real Estate Taxes | 616.96 | 500.00 |
| Net Rental Income | 0.00 | 0.00 | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 16,667.00 | $ 0.00 | $ 16,667.00 | Total | $ 3,935.84 | 2,347.65 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income    Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed [ ] Jointly [x] Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ 0.00 | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| | | Name and address of Company | $ Payment/Months | $ |
| List checking and savings accounts below | | *** SEE ADDENDUM *** | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| ING DIRECT | | | | |
| | | Acct. no. | | |
| Acct. no. | $ 107,523.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 118920-1 | $ 3,659.59 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 118920-2 | $ 222.03 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 118920-22 | $ 3,659.74 | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number & description) | $ | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value | $ 0.00 | | | |
| Face amount: $ 0.00 | | | | |
| Subtotal Liquid Assets | $ 115,264.36 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 2,025,000.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 89,692.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) Neg. Rent | $ 1,012.26 | |
| | | Total Monthly Payments | $ 1,209.26 | |
| Total Assets a. | $ 2,229,956.36 | Net Worth (a minus b) $ 2,221,242.36 | Total Liabilities b. | $ 8,714.00 |

## VI. ASSETS AND LIABILITIES

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 131 North Pleasant Road | R COND | $ 400000 | $ 131896 | $ 2500 | $ 663 | $ 0 | $ 1212 |
| 8940 CALLE DEL REY | H SFR | 875000 | 608000 | 0 | 3264 | 555 | 0 |
| 2846 Rainwood Court San Jose, CA, 95148 | R SFR | 750000 | 482000 | 2050 | 3207 | 555 | -2224 |
| | Totals | $ 2025000 | $ 1221896 | $ 4550 | $ 7134 | $ 1110 | $ -1012 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s).

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 0.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | 0.00 |
| d. Refinance (incl. debts to be paid off) | 478,000.00 |
| e. Estimated prepaid items | 60.97 |
| f. Estimated closing costs | 3,905.00 |
| g. PMI, MIP, Funding Fee | 0.00 |
| h. Discount (if Borrower will pay) | 0.00 |
| i. Total costs (add items a through h) | 481,965.97 |
| j. Subordinate financing | 0.00 |
| k. Borrower's closing costs paid by Seller | 0.00 |
| l. Other Credits (explain) | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 485,000.00 |
| n. PMI, MIP, Funding Fee financed | 0.00 |
| o. Loan amount (add m & n) | 485,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -3,034.03 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | x | | x |
| b. Have you been declared bankrupt within the past 7 years? | | x | | x |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | x | | x |
| d. Are you a party to a lawsuit? | | x | | x |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name, and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | x | | x |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | x | | x |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | x | | x |
| h. Is any part of the down payment borrowed? | | x | | x |
| i. Are you a co-maker or endorser on a note? | | x | | x |
| j. Are you a U.S. citizen? | x | | x | |
| k. Are you a permanent resident alien? | | x | | x |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | | x | | x |
| m. Have you had an ownership interest in a property in the last three years? | x | | x | |
| (1) What type of property did you own – – principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| (2) How did you hold title to the home – – solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors, and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in the application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 4/19/07 | X | 4/19/07 |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | [x] I do not wish to furnish this information. | | CO-BORROWER | [x] I do not wish to furnish this information. | |
|---|---|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native ☐ Native Hawaiian or Other Pacific Islander | ☐ Asian ☐ White | ☐ Black or African American | Race: | ☐ American Indian or Alaska Native ☐ Native Hawaiian or Other Pacific Islander | ☐ Asian ☐ White | ☐ Black or African American |
| Sex: | ☐ Female | ☐ Male | Sex: | ☐ Female | ☐ Male |

| To be Completed by Interviewer This application was taken by: | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| ☐ Face-to-face interview | Interviewer's Signature | Utah Financial, Inc |
| ☐ Mail | Date 04/04/2007 | 4001 South 700 East #100 |
| [x] Telephone | Interviewer's Phone Number (incl. area code) | Salt Lake City, UT 84107 |
| ☐ Internet | (801) 269-2400 | |

VMP®-21N(CA) (0512).02   Page 3 of 4   0092139302

Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05

| CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION | | |
|---|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>RICK  YU | Agency Case Number: |
| | Co-Borrower:<br>YU,  SERLYN L. | Lender Case Number:<br>0092139302 |

Under California Civil Code 1812.30(j) "Credit applications for the obtainment of money, goods, labor, or services shall clearly specify that the applicant, if married, may apply for a separate account."

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | 4-19-07 | X | 4/19/07 |

0092139302
Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
VMP®-21N(CA) (0512) 02

Page 4 of 4

# EXHIBIT 7

JUN-01-2007 FRI 12:12 PM FATCO EVERGREEN              FAX NO. 408 528 8979              P. 01

OMB Approval No. 2502-0265

| A. Settlement Statement | B. Type of Loan | | |
|---|---|---|---|
| | 1-5. Loan Type Conv. Unins. | | |
| **First American Title Company** **Final Statement** | 6. File Number 4311-2746910 | | |
| | 7. Loan Number 0092135069 | | |
| | 8. Mortgage Insurance Case Number | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside this closing; they are shown here for informational purposes and are not included in the totals.

D. Name of Borrower: Rick Yu, Serlyn Yu
8940 Calle Del Rey, Gilroy, CA 95020

E. Name of Seller:

F. Name of Lender: Greenpoint Mortgage Funding, Inc.
2855 East Cottonwood ParkwaySuite 350
Salt Lake City, UT 84121-7053

G. Property Location: 8940 Calle Del Rey, Gilroy, CA 95020

| H. Settlement Agent: First American Title Company Address: 2990 East Capitol Expressway, Suite 40, San Jose, CA 95148 | | I. Settlement Date: 04/24/2007 |
|---|---|---|
| Place of Settlement Address: 2990 East Capitol Expressway, Suite 40, San Jose, CA 95148 | | Print Date: 06/01/2007, 12:19 PM |
| | | Disbursement Date: 04/24/2007 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 5,418.72 | 403. Total Deposits | |
| 104. Supplemental Summary          POC $3,701.74 | 604,125.75 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 120. Gross Amount Due From Borrower | 607,544.47 | 420. Gross Amount Due To Seller | |
| 200. Amounts Paid By Or In Behalf of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 606,000.00 | 502. Settlement charges (line 1400) | |
| 203. Existing loan(s) taken subject | | 503. Existing loan(s) taken subject | |
| 204. Credit to Borrower from Broker from Utah Financial Inc. | 170.00 | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 606,170.00 | 520. Total Reduction Amount Due Seller | |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from Borrower (line 120) | 607,544.47 | 601. Gross amount due to Seller (line 420) | |
| 302. Less amounts paid by/for Borrower (line 220) | 606,170.00 | 602. Less reductions in amounts due to Seller (line 520) | |
| 303. Cash ( From) (X To) Borrower | 825.55 | 603. | |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent:_____                                                    Date: 6/1/07

* See Supplemental Page for details.

File No. 4311-2746910

| L. Settlement Charges | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | | |
| Division of Commission (line 700) as follows | | | |
| 701. | | | |
| 702. | | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| 800. Items Payable in Connection with Loan | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount | | | |
| 803. Appraisal Fee - Utah Financial Inc. | POC $350.00 | | |
| 804. Credit Report | | | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Premium | | | |
| 807. Assumption Fee | | | |
| 808. Document Preparation Fee - Greenpoint Mortgage Funding, Inc. | | 390.00 | |
| 809. Tax Service Fee - Greenpoint Mortgage Funding, Inc. | | 79.00 | |
| 810. Flood Certification Fee - Greenpoint Mortgage Funding, Inc. | | 11.00 | |
| 811. Underwriting Fee - Greenpoint Mortgage Funding, Inc. | | 800.00 | |
| 812. Yield Spread Premium - Utah Financial Inc. | POC $23,560.00 | | |
| 813. | | | |
| 814. | | | |
| Supplemental Summary | | | |
| 900. Items Required by Lender to be Paid in Advance | | | |
| 901. Interest 04/23/07 to 05/01/07 @$141.590000/day - Greenpoint Mortgage Funding, Inc. | | 1,132.72 | |
| 902. | | | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | | |
| 905. | | | |
| Supplemental Summary | | | |
| 1000. Reserves Deposited with Lender | | | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | | |
| 1003. City Property Taxes | | | |
| 1004. County Property Taxes | | | |
| 1005. Annual assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. Aggregate Accounting Adjustment | | | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee - First American Title Company | | 450.00 | |
| 1102. Abstract or title search | | | |
| 1103. Title examination | | | |
| 1104. Title Insurance Binder | | | |
| 1105. Document Fee | | | |
| 1106. Notary Fee | | | |
| 1107. Attorney Fee | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance - See supplemental page for breakdown of individual fees and payees | | 850.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's coverage $808,000.00 Premium: $850.00 | | | |
| 1110. Owner's coverage $0.00 | | | |
| 1111. | | | |
| 1112. | | | |
| 1113. | | | |
| 1114. | | | |
| 1115. | | | |
| 1116. | | | |
| 1117. | | | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. *Recording fees: Deed $0.00 Mortgage $81.00 Release $0.00 | | 81.00 | |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps: | | | |
| 1204. | | | |
| 1205. | | | |
| 1206. | | | |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection to | | | |
| 1303. Notary/Signing to Lupe Winans | | 125.00 | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| 1309. | | | |
| 1310. | | | |
| 1311. | | | |
| 1312. | | | |
| 1313. | | | |
| 1314. | | | |
| Supplemental Summary | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | 3,418.72 | |

| Supplemental Page<br>HUD-1 Settlement Statement | File No.<br>4311-2748910 |
|---|---|
| **First American Title Company**<br>**Final Statement** | Loan No.<br>0092138369<br><br>Settlement Date:<br>04/24/2007 |

Borrower Name & Address: Rick Yu, Serlyn Yu
8840 Calle Del Rey, Gilroy, CA 95020

Seller Name & Address:

| Section L. Settlement Charges continued | | Paid From<br>Borrower's<br>Funds at<br>Settlement | Paid From<br>Seller's<br>Funds at<br>Settlement |
|---|---|---|---|
| 1109.   Supplemental Summary | 850.00 | | |
| a) ALTA Extended Loan Policy 1992 - 1 - First American Title Company | | 850.00 | |
| 1201.   Supplemental Summary | 81.00 | | |
| a) Record Trust Deed - 1 - First American Title Company | | 81.00 | |

| Section J.  Summary of Borrower's Transaction continue | | | |
|---|---|---|---|
| 100.  Gross Amount Due From Borrower | | Borrower Charges | Borrower Credits |
| 104.    Supplemental Summary | 507,944.24 | | |
| a) Principal Balance   - Virtual Bank a Division of Lydian Private | | 504,750.00 | . |
| Interest on Payoff Loan 03/01/07 to 04/25/07 @\$57.040000/day | | 3,194.24 | |
| 104.    Supplemental Summary | 60,488.59 | | |
| b) Principal Balance   - Wells Fargo Bank | | 59,250.00 | |
| Interest on Payoff Loan 04/17/07 to 04/25/07 @\$10.980000/day | | 109.60 | |
| Int. Per demand to 04/17/07 @ \$10.96/day | | 514.99 | |
| Termination Fees | | 500.00 | |
| Lien Release & Recording fee | | 54.00 | |
| Demand Statement Fee | | 30.00 | |
| Fax Fee | | 10.00 | |
| 104.    Supplemental Summary | 35,712.92 . | | |
| c) Principal Balance   - Wells Fargo Bank | | 35,250.00 | |
| Interest on Payoff Loan 04/03/07 to 04/26/07 @\$6.590000/day | | 144.98 | |
| Int. Per demand to 04/4/07 @ \$6.59/day | | 223.94 | |
| Lien Release & Recording fee | | 54.00 | |
| Demand statement Fee | | 30.00 | |
| Fax Fee | . | 10.00 | |
| 104.    Supplemental Summary | 0.00 | | |
| d) 2nd Tax installment 2006/07 Pmt posted 4/7/07   to Santa Clara County Tax Collector | POC \$3,701.74 | | |
| 200.  Amounts Paid By Or In Behalf of Borrower | | | |
| The following Section is restated from the Settlement Statement Page 1 | | | |
| 300.  Cash At Settlement From/To Borrower | | 600.  Cash At Settlement To/From Seller | |
| 301.  Gross amount due from Borrower (line 120) | 607,544.47 | 601.  Gross Amount due to Seller (line 420) | |
| 302.  Less amounts paid by/for Borrower (line 220) | 608,170.00 | 601.  Less reductions in amounts due to Seller (line 520) | |
| 303.  Cash ( From) (X To) Borrower | 625.55 | 603. | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

# EXHIBIT 8

| A. Settlement Statement | | OMB Approval No. 2502-0265 | |
|---|---|---|---|
| | | **B. Type of Loan** | |
| | | 1-5. Loan Type Conv. Unins. | |
| **First American Title Company** | | 6.   File Number 4311-2746889 | |
| **Final Statement** | | 7.   Loan Number 6092135302 | |
| | | 8.   Mortgage Insurance Case Number | |

C.   Note:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside this closing; they are shown here for informational purposes and are not included in the totals.

D.   Name of Borrower:  Rick Yu, Serlyn L. Yu
2846 Rainwood Court, San Jose, CA 95148

E.   Name of Seller:

F.   Name of Lender:  Greenpoint Mortgage Funding, Inc.
2855 East Cottonwood ParkwaySuite 350
Salt Lake City, UT 84121-7053

G.   Property Location:  2846 Rainwood Court, San Jose, CA 95148

| H.   Settlement Agent: First American Title Company | | I. | |
|---|---|---|---|
| Address: 2990 East Capitol Expressway, Suite 40, San Jose, CA 95148 | | Settlement Date: 04/24/2007 | |
| Place of Settlement Address: 2990 East Capitol Expressway, Suite 40, San Jose, CA 95148 | | Print Date: 05/01/2007, 12:18 PM | |
| | | Disbursement Date: 04/24/2007 | |

| J. Summary of Borrower's Transaction | | | K. Summary of Seller's Transaction | | |
|---|---|---|---|---|---|
| 100. Gross Amount Due From Borrower | | | 400. Gross Amount Due To Seller | | |
| 101. Contract Sales Price | | | 401. Contract Sales Price | | |
| 102. Personal Property | | | 402. Personal Property | | |
| 103. Settlement charges to borrower (line 1400) | | 5,115.08 | 403. Total Deposits | | |
| 104. Supplemental Summary          POC $1,967.07 | | 477,417.75 | 404. | | |
| 105. | | | 405. | | |
| Adjustments for items paid by seller in advance | | | Adjustments for items paid by seller in advance | | |
| 106. City/town taxes | | | 406. City/town taxes | | |
| 107. County taxes | | | 407. County taxes | | |
| 108. Assessments | | | 408. Assessments | | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 113. | | | 413. | | |
| 114. | | | 414. | | |
| 115. | | | 415. | | |
| 120. Gross Amount Due From Borrower | | 482,532.83 | 420. Gross Amount Due To Seller | | |
| 200. Amounts Paid By Or In Behalf of Borrower | | | 500. Reductions In Amount Due to Seller | | |
| 201. Deposit or earnest money | | | 501. Excess deposit (see instructions) | | |
| 202. Principal amount of new loan(s) | | 485,000.00 | 502. Settlement charges (line 1400) | | |
| 203. Existing loan(s) taken subject | | | 503. Existing loan(s) taken subject | | |
| 204.   Credit to Borrower from Broker from Utah Financial Inc. | | 525.00 | 504. Payoff of first mortgage loan | | |
| 205. | | | 505. Payoff of second mortgage loan | | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| Adjustments for items unpaid by seller | | | Adjustments for items unpaid by seller | | |
| 210. City/town taxes | | | 510. City/town taxes | | |
| 211. County taxes | | | 511. County taxes | | |
| 212. Assessments | | | 512. Assessments | | |
| 213. | | | 513 | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. Total Paid By/For Borrower | | 485,525.00 | 520. Total Reduction Amount Due Seller | | |
| 300. Cash At Settlement From/To Borrower | | | 600. Cash At Settlement To/From Seller | | |
| 301. Gross amount due from Borrower (line 120) | | 482,532.83 | 601. Gross amount due to Seller (line 420) | | |
| 302. Less amounts paid by/for Borrower (line 220) | | 485,525.00 | 602. Less reductions in amounts due to Seller (line 520) | | |
| 303. Cash ( From) (X To) Borrower | | 2,992.17 | 603. | | |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.
Settlement Agent:_____                                                    Date: 6/1/07

* See Supplemental Page for details.

File No. 4311-2746889

| L. Settlement Charges | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | | |
| Division of Commission (line 700) as follows | | | |
| 701. | | | |
| 702. | | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| 800. Items Payable in Connection with Loan | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount | | | |
| 803. Appraisal Fee - Utah Financial Inc. | POC $375.00 | | |
| 804. Credit Report | | | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Premium | | | |
| 807. Assumption Fee | | | |
| 808. Document Preparation Fee - Greenpoint Mortgage Funding, Inc. | | 390.00 | |
| 809. Tax Service Fee - Greenpoint Mortgage Funding, Inc. | | 79.00 | |
| 810. Flood Certification Fee - Greenpoint Mortgage Funding, Inc. | | 11.00 | |
| 811. Underwriting Fee - Greenpoint Mortgage Funding, Inc. | | 300.00 | |
| 812. Yield Spread Premium - Utah Financial Inc. | POC $18,388.75 | | |
| 813. Processing/Admin Fee - Utah Financial Inc. | | 1,155.00 | |
| 814. Appraisal/Final Inspct. Fee - Utah Financial Inc. | | 150.00 | |
| Supplemental Summary | | | |
| 900. Items Required by Lender to be Paid in Advance | | | |
| 901. Interest 04/23/07 to 05/01/07 @$112.95000/day - Greenpoint Mortgage Funding, Inc. | | 903.60 | |
| 902. | | | |
| 903. Hazard Insurance Premium for to State Farm Insurance | | 617.48 | |
| 904. | | | |
| 905. | | | |
| Supplemental Summary | | | |
| 1000. Reserves Deposited with Lender | | | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | | |
| 1003. City Property Taxes | | | |
| 1004. County Property Taxes | | | |
| 1005. Annual assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. Aggregate Accounting Adjustment | | | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee | | | |
| 1102. Abstract or title search | | | |
| 1103. Title examination | | | |
| 1104. Title Insurance Binder | | | |
| 1105. Document Fee | | | |
| 1106. Notary Fee | | | |
| 1107. Attorney Fee | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance -- See supplemental page for breakdown of individual fees and payees | | 1,300.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's coverage $485,000.00 | | | |
| 1110. Owner's coverage $0.00 | | | |
| 1111. | | | |
| 1112. | | | |
| 1113. | | | |
| 1114. | | | |
| 1115. | | | |
| 1116. | | | |
| 1117. | | | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. *Recording fees: Deed $0.00 Mortgage $84.00 Release $0.00 | | 84.00 | |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps: | | | |
| 1204. | | | |
| 1205. | | | |
| 1206. | | | |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection to | | | |
| 1303. Notary/Signing to Lupe Winans | | 125.00 | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| 1309. | | | |
| 1310. | | | |
| 1311. | | | |
| 1312. | | | |
| 1313. | | | |
| 1314. | | | |
| Supplemental Summary | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | 5,115.08 | |

* See Supplemental Page for details.

| Supplemental Page<br>HUD-1 Settlement Statement | File No.<br>4311-2746889 |
|---|---|
| **First American Title Company**<br>**Final Statement** | Loan No.<br>0092139302 |
| | Settlement Date:<br>04/24/2007 |

Borrower Name & Address: Rick Yu, Serlyn L. Yu
2846 Rainwood Court, San Jose, CA 95148

Seller Name & Address:

| Section L. Settlement Charges continued | | Paid From<br>Borrower's<br>Funds at<br>Settlement | Paid From<br>Seller's<br>Funds at<br>Settlement |
|---|---|---|---|
| 1108. Supplemental Summary | 1,300.00 | | |
| a) One Rate (inc. 1108/Title Ins and 1101/Escrow Fee) - First American Title Company | | 1,300.00 | |
| 1201. Supplemental Summary | 84.00 | | |
| a) Record Trust Deed - 1 - First American Title Company | | 84.00 | |

| Section J. Summary of Borrower's Transaction continue | | Borrower Charges | Borrower Credits |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | | |
| 104. Supplemental Summary | 433,500.20 | | |
| a) Principal Balance - Wachovia | | 432,000.00 | |
| Interest on Payoff Loan 04/01/07 to 04/26/07 @$57.700000/day | | 1,500.20 | |
| 104. Supplemental Summary | 43,917.69 | | |
| b) Principal Balance - Citimortgage | | 42,701.92 | |
| Statement/Forwarding Fee | | 30.00 | |
| Charges due | | 50.00 | |
| Recording Fee | | 10.00 | |
| Int. Per demand to 05/03/07 @ $10.23/day | | 675.65 | |
| Early Closure Release fee | | 450.00 | |
| 104. Supplemental Summary | 0.00 | | |
| c) 2nd Tax Installment 2006/07 to Santa Clara County Tax Collector | POC $1,967.07 | | |
| 200. Amounts Paid By Or In Behalf of Borrower | | | |
| The following Section is restated from the Settlement Statement Page 1 | | | |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from Borrower (line 120) | 482,532.85 | 601. Gross Amount due to Seller (line 420) | |
| 302. Less amounts paid by/for Borrower (line 220) | 485,925.00 | 602. Less reductions in amounts due to Seller (line 520) | |
| 303. Cash ( From) (X To) Borrower | 3,392.17 | 603. | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

1
RONALD M. ARLAS, ESQ. #59091
2
ARLAS & SMITHTON
100 Wood Hollow Drive
3
Novato, CA 94945
(415) 878-5390
4
Fax (415) 878-3595

5
EDWARD R. BUELL, ESQ. #240494
6
GREENPOINT MORTGAGE FUNDING, INC.
100 Wood Hollow Drive
7
Novato, Ca. 94945
(415) 878-5616
8
Fax (4150 878-3593

9
Attorneys for Defendant
10
GREENPOINT MORTGAGE FUNDING, INC.

11
**UNITED STATES DISTRICT COURT**
12
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
13
**(San Jose Division)**

14
RICK YU et al.
15
                  Plaintiffs,                    Case No. C O8-01771-RMW-PVT
16
                  vs.
17
UTAH FINANCIAL, INC., et al.                     [Assigned to Magistrate Patricia V. Trumbell]
                  Defendants.
18
                                                 CROSS-CLAIM OF DEFENDANT
19
GREENPOINT MORTGAGE FUNDING,                     GREENPOINT MORTGAGE
INC.,                                            FUNDING, INC. FOR
20                                               INDEMNIFICATION AND
                  Cross-claimant                 BREACH OF CONTRACT
21
                  vs.
22
UTAH FINANCIAL, INC.; and DOES 1
23
through 20, inclusive,
                  Cross-Defendants
24
25
AND RELATED COUNTER-CLAIMS
26
        COMES NOW cross-claimant GreenPoint Mortgage Funding, Inc. ("GPM"), and alleges as
27
follows:
28

1.    The claims alleged against GPM in the underlying Complaint that was filed by Plaintiff on March 4, 2008 were brought pursuant to federal law, to wit, the Real Estate Settlement Procedures Act ("RESPA") codified at 12 U.S.C. §2601 et seq.    The Court therefore has supplemental Jurisdiction over the state law claims raised in this cross-claim pursuant to 28 U.S.C. §1367.

## GENERAL ALLEGATIONS

2.    Cross-claimant GPM, is a New York corporation, which maintains its principal place of business in Marin County, California.  GPM is licensed by the California Secretary of State to conduct business in California.  GPM was at all times herein relevant a wholesale mortgage banker, which funded and acquired residential mortgage loans, facilitated through independent mortgage brokers, secured by one to four residential dwelling units.  Such loans are then resold to secondary mortgage market investors.  GPM stopped originating new loans in August 2007.

3.    GPM is informed and believes, and on that basis alleges that at all times herein relevant, RICK YU and SERLYN YU ("Plaintiffs" or the "YUS") are and were residents of California residing in Santa Clara County.

4.    GPM is informed and believes, and on that basis alleges that at all times herein relevant, cross-defendant UTAH FINANCIAL, INC. ("UFI") was a Utah corporation that was licensed to conduct business within the State of California.

5.    GPM is informed and believes, and on that basis alleges that at all times herein each cross-defendant was a duly authorized agent and employee of the remaining cross-defendants and were at all times acting within the course and scope of such agency and employment with the permission, knowledge, consent and ratification of each of the remaining cross-defendants.

6.    The true names and capacities, whether individual, corporate, associate or otherwise of cross-defendants Does 1-20, inclusive, are unknown to GPM, and, therefore, GPM sues said

cross-defendants by such fictitious names, and GPM will amend this cross-claim to show their true names and/or capacities when the same have been ascertained. GPM is further informed and believes, and on that basis alleges, that each of the fictitiously named cross-defendants are in some manner responsible for the events and happenings herein referred to and proximately caused the damage suffered by GPM. For ease of reference, whenever a named cross-defendant is referred to herein, such reference shall be deemed to include Does 1-20.

7.     On or about June 6, 2002, GPM and cross-defendant UFI entered into a contract entitled GREENPOINT MORTGAGE FUNDING, INC. BROKER AGREEMENT ("AGREEMENT"), wherein GPM agreed to fund approved residential mortgage loans submitted by UFI on behalf of consumer borrowers. Cross-defendant UFI is the "BROKER" within the meaning of the AGREEMENT. A true and correct copy of said AGREEMENT is attached hereto and incorporated herein as Exhibit 1.

8.     According to paragraphs 9 and 10 of the Complaint, UFI, through its agents and employees, contacted the YUS in March 2007 regarding a refinance of their current home loans. At that time the YUS were seeking to refinance both their primary residence, which was located at 8940 Calle Del Rey, Gilroy, California (the "GILROY PROPERTY") as well as their investment property, which was located at 2846 Rainwood Court, San Jose, California (the "SJ PROPERTY").

9.     According to paragraphs 25 and 26 of the Complaint, UFI, and its agents and employees, were the fiduciary agents of the YUS. UFI, including its agents and employees, were not and never have been an agent or employee of GPM at any time.

10.     In March of 2007, UFI submitted a residential loan package to GPM on behalf of the YUS ("GILROY LOAN") for a loan in the principle amount of $608,000.00 (the "GILROY NOTE"), which was secured by a DEED OF TRUST ("DOT") on the GILROY PROPERTY. True and correct copies of the GILROY NOTE and the GILROY DOT have been attached hereto as

---

CROSS-CLAIM OF DEFENDANT
GREENPOINT MORTGAGE FUNDING, INC.                    -3-                    C 08-01771-RMW-PVT

1
2
3
4
5
6

Exhibits 2 and 3 respectively. Also in March 2007, UFI submitted a residential loan package to GPM on behalf of the YUS ("SJ LOAN") for a loan in the principle amount of $485,000.00 (the "SJ NOTE"), which was secured by a DOT on the SJ PROPERTY. True and correct copies of the SJ NOTE and the SJ DOT have been attached hereto as Exhibits 4 and 5 respectively. The GILROY LOAN and the SJ LOAN will hereinafter be collectively referred to as the "YU LOANS".

7
8

11.    Based on the information contained in the loan packages submitted to GPM by the YUS authorized agent, UFI, GPM approved the YU LOANS and funded it on April 23, 2007.

9
10
11
12
13
14
15

12.    On or about May 17, 2007, GPM sold the GILROY NOTE and the SJ NOTE to an investor ("INVESTOR") on the secondary market. GPM continued to service the GILROY NOTE and the SJ NOTE until the servicing for both the YU LOANS was transferred to GMAC Mortgage Corporation in August 2007. At that time, GPM ceased to have any further ownership or agency interest in the YU LOANS. Therefore, since August 2007 GPM has had no financial or proprietary interest in the GILROY PROPERTY or in the SJ PROPERTY.

16
17

### First Cause of Action
### Indemnification
### (Against All Cross-Defendants)

18
19
20

13.    GPM realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 12, above.

21
22

14.    Section 13 of the AGREEMENT, entitled "BROKER'S INDEMNIFICATION", states in pertinent parts as follows:

23
24
25
26
27

"Broker shall indemnify, defend, and hold Lender and its shareholders, directors, officers, agents, employees, successors, and assigns harmless from and against, and shall reimburse the same with respect to any and all loss, damage, liability, costs, and expenses, including reasonable attorneys' fees (including the allocated cost of in-house counsel), from any cause whatsoever, including but not limited to:
        a. any breach of any representation or warranty contained in Section 11 above;
        b. Broker's failure to perform any obligation set forth in this Agreement."

28

CROSS-CLAIM OF DEFENDANT
GREENPOINT MORTGAGE FUNDING, INC.                    -4-                    C 08-01771-RMW-PVT

15.    Section 11, of the AGREEMENT, entitled "BROKER'S WARRANTIES", states as follows:

"BROKER represents and warrants to LENDER, (i) as of the time any Loan Package is submitted to LENDER, and (ii) as of the time the Loan is funded and closed, that:

a. <u>No Untrue Statements</u>: BROKER shall not submit in any Loan Package any false, fraudulent, inaccurate, or erroneous information or statements, or omit any material facts necessary to make any statement or information included in the Loan Package true, accurate, and understandable.  For purposes of this warranty, the term "submit" shall mean (i) submitting a Loan Package to LENDER with false, fraudulent, inaccurate, or erroneous information regardless of BROKER'S actual or prior knowledge of such false, fraudulent, inaccurate, or erroneous information; or (ii) submitting a Loan Package to LENDER with false, fraudulent, inaccurate, or erroneous information after failing to follow standard practices and procedures prevalent in the mortgage banking industry; or (iii) submitting a Loan Package to LENDER containing an appraisal that contains false, fraudulent, inaccurate, or erroneous information where such information was or should have been within the knowledge of or control of appraiser; or (iv) submitting a Loan Package to LENDER where the BROKER has a "non-arms length" business, financial, or personal affiliation with, or financial interest, in the appraiser."

16.    On April 17, 2007, the YUS signed a Residential Loan Application (the " GILROY 1003") for the GILROY LOAN, which was submitted by UFI to GPM for funding.  A true and correct copy of the GILROY 1003 is attached hereto as Exhibit 6.

17.    On April 19, 2007, the YUS signed a Residential Loan Application (the "SJ 1003") for the SJ LOAN, which was submitted by UFI to GPM for funding.  A true and correct copy of the SJ 1003 is attached hereto as Exhibit 7.

18.    Both the GILROY 1003 and the SJ 1003 state that RICK YU earned a monthly income of $16,667.00 as a Police Officer with the San Jose Police Department.   Over a 12 month period, that equates to an annual salary of approximately $200,000. GPM is now informed and believes that the stated income of RICK YU greatly exceeds the monthly income for a San Jose Police Officer.  Therefore, GPM is informed and believes that the GILROY 1003 and the SJ 1003 that were submitted by UFI contained false, fraudulent inaccurate and erroneous information regarding RICK YU's monthly employment earnings.  Based on the information contained in the

1    loan packages that were submitted by UFI, GPM approved and funded the YU LOANS on April 23,

2    2007.

3    19.    Based on the foregoing, UFI violated Section 11 of the AGREEMENT by submitting

4    a loan package that contained false, fraudulent, inaccurate and erroneous information.  Therfore,

5    pursuant to Section 13 of the AGREEMENT, GPM is entitled to demand that UFI shall indemnify it

6    for any and all loss, damage, liability, costs, and expenses, including reasonable attorneys' fees for

7    the violation of Section 11 of the AGREEMENT.

8

9    20.    Based on Section 13 of the AGREEMENT, GPM would respectfully request that this

10   Court order cross-defendant UFI to indemnify GPM for the full amount of the YU LOANS and any

11   damage, liability, cost and expenses incurred as a result of the violation of the AGREEMENT.  GPM

12   is also entitled to indemnification for its attorney's fees and costs incurred in defending the main

13   action herein, brought by the YUS against GPM.

14

15   21.    By serving this cross-claim on cross-defendant UFI, GPM hereby notifies UFI that

16   they are required to indemnify GPM for its losses, etc., pursuant to Paragraph 13 of the

17   AGREEMENT, cited above.  GPM prays leave to amend this cross-claim when the exact amount is

18   known.

19

20   22.    GPM has incurred and continues to incur, necessary and reasonable attorney's fees

21   and other legal costs in prosecuting this action against counter and cross-defendants.  By the terms of

22   Section 13 and 19(c) of the AGREEMENT between GPM and UFI, cross-claimant GPM is entitled

23   to recover these fees and costs from UFI.  Cross-claimant GPM does not know the full amount

24   thereof at this time and will move to amend this cross-claim to state the amount when it becomes

25   known to it, or on proof thereof.

26   ///

27   ///

28

CROSS-CLAIM OF DEFENDANT                                    -6-                          C O8-01771-RMW-PVT
GREENPOINT MORTGAGE FUNDING, INC.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(Against All Cross-Defendants)**

23.    GPM realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 12 and 14 through 20, above.

24.    GPM and UFI entered into a valid written contract in the form of the AGREEMENT on June 6, 2002. A copy of the AGREEMENT is attached hereto as Exhibit 1.

25.    GPM performed all of the conditions, covenants, and promises required of GPM under the AGREEMENT.

26.    UFI breached the AGREEMENT by submitting two loan packages (for the GILROY LOAN and for the SJ LOAN) that contained false, fraudulent, inaccurate and erroneous information in clear violation of Section 11 of the AGREEMENT.

27.    GPM as been damaged in an amount that is unknown at this time as a result of the breach by UFI. GPM prays leave to amend this cross-complaint when the exact damages resulting from this breach are known.

28.    GPM has incurred and continues to incur, necessary and reasonable attorney's fees and other legal costs in defending itself from the main action brought by the YUS against GPM and the attorney's fees and costs incurred in prosecuting this action against cross-defendant UFI. By the terms of Section 19(c) of the AGREEMENT between GPM and UFI, cross-claimant is entitled to recover these fees and costs from UFI. Cross-claimant GPM does not know the full amount thereof at this time and will move to amend this cross-claim to state the amount when it becomes known to it, or on proof thereof.

WHEREFORE, GPM prays for judgment against cross-defendants, and each of them, jointly and severally, as follows:

1. GPM requests the Court for an order that cross-defendant UFI indemnify GPM in an amount of no less than $1,093,000.00, the full amount of the YU LOANS, or according to proof;

2. GPM requests the Court for breach of contract damages from cross-defendant UFI in an amount of no less than $1,093,000.00, the full amount of the YU LOANS, or according to proof;

3. For reasonable attorney's fees and costs;

4. For costs of the suit herein incurred; and

5. For such other and further relief the court may deem proper.


Dated: August 27, 2008                   .        /s/ Ronald M. Arlas                    .
                                         RONALD M. ARLAS, ESQ.
                                         EDWARD R. BUELL III, ESQ.
                                         Attorney for Defendant and Cross-Complainant
                                         GREENPOINT MORTGAGE FUNDING, INC.

\Legal\PLEADING\Yu v. Utah Financial,  GPM  #7201\Cross-Claim of GPM 8.08.doc

# EXHIBIT 1

**GreenPoint** ⊙ **Mortgage**

# GREENPOINT MORTGAGE FUNDING, INC.
## BROKER AGREEMENT

This Broker Agreement (the "Agreement"), is entered into by and between ___Utah Financial___, a _____ Corporation doing business as _____ ("Broker"), and GREENPOINT MORTGAGE FUNDING, INC. , a New York Corporation ("Lender").

### RECITALS

A. The Parties hereto wish to establish a non-exclusive relationship whereby Broker will submit applications for loans to be secured by first or second priority liens against 1-4 family residential properties (the "Loans") to Lender on behalf of Broker's clients ("Borrowers") for possible funding by Lender.

B. The Parties desire to enter into this Broker Agreement to set forth the terms of their relationship.

**NOW THEREFORE**, the Parties do hereby agree as follows:

### AGREEMENT

1. **NON-EXCLUSIVE AGREEMENT:** Nothing contained herein shall obligate Broker to submit all loan funding requests that it brokers to Lender, it being understood that this shall be a non-exclusive agreement. Nothing contained herein shall obligate Lender to fund Loans submitted by Broker without Lender's prior review and approval at Lender's sole discretion. Lender's obtaining of a Loan Package (as defined below) from Broker does not:
   a. prohibit Lender from considering loan application packages from other sources,
   b. obligate Lender to accept or consider other or future packages from Broker, or
   c. establish an agency relationship with Broker.

2. **GENERAL BROKER RESPONSIBILITY:** With regard to Loans submitted by Broker to Lender, Broker shall describe and represent to a Borrower Lender's policies, procedures and pricing only as set forth by Lender. Broker shall not advertise or in any manner represent that it is employed by, an agent of, representative of, or is in any way related to Lender. Broker shall be responsible at its own expense for the accurate preparation and execution of a complete property and credit Loan Application Package ("Loan Package") on each Loan request submitted, under such programs, procedures, and fee schedules as Lender periodically may establish, including but not limited to those items listed below or as may be required by Lender in conformance with Lender's policies and procedures as established and as may be modified from time to time:
   a. Loan application
   b. Supporting credit information
   c. Supporting verification of credit, employment, deposits, and mortgage payment history
   d. Copies of all government required disclosures
   e. Original appraisal of the property to be financed plus all supporting information necessary to substantiate Borrower's qualification for the Loan
   f. Such other credit, financial, and other information as Lender may require.

Broker shall be solely responsible for any statements, explanations, or claims made to Borrower about the terms of the Loan, the approval process, or the status of the Borrower's loan approval. The contents of all Loan Packages submitted to Lender immediately shall become the property of Lender and Lender hereby assigns all rights, title, and interest in the file (except for Broker's right to receive an origination fee) to Lender. All information contained in a Loan Package may be subject to Lender's independent verification. Broker understands that, in consideration of Lender funding Loans offered by Broker, Lender relies on Broker's full cooperation, before and after the funding of any Loan. Broker agrees to fully assist Lender in obtaining any information and documentation Lender deems necessary and to otherwise cooperate fully with Lender to fulfill the purposes of this Agreement.

3. **LOAN APPROVAL:** Loan approval shall be within Lender's sole discretion. Broker shall not consult Lender to do anything or take action without the prior written approval of Lender. Without limiting the generality of the foregoing, Broker shall not represent that Lender has approved or will approve any loan until Broker is so informed by Lender in writing. All loan approvals are conditioned unless and until Borrower actually executes escrow instructions presented to Borrower in order to close escrow. It is also fully understood and agreed that Lender's approval of the loan application is based upon submission by Broker of true and accurate information in the Loan Package and all supporting documentation, including but not limited to the handwritten and typed Form 1003 and any and all appraisals. The fact that final approval of the loan application is solely within the discretion of the Lender shall not be used as a defense to a claim that Broker has breached any part of this Agreement or that Broker has submitted false or inaccurate information in the Loan Package and supporting documentation, including but not limited to the Form 1003, and any and all appraisals.

4. **UNDERWRITING OF LOANS:** Lender shall have the right, but not the obligation, to underwrite any Loan submitted for funding pursuant to this Agreement. However, the exercise of this right by Lender shall not affect in any way Broker's obligations hereunder, including, without limitation, Broker's reputation obligations under Section 15 hereof and Broker's indemnification obligations under Section 13 hereof. Broker understands that Lender routinely conducts quality control audits to re-verify income/deposit information, credit documentation, and appraisals submitted by Broker. Broker understands employment is verbally verified on all loan programs offered by Lender. Broker understands that any discrepancies found by Lender during quality control and verbal audits are grounds for immediate cancellation of this Agreement and possible notification to applicable state and governmental agencies, and are a breach of Section 11 below.

5. **CLOSING OF LOANS:** All Loans shall close in Lender's name or in the name of an affiliate of Lender.

6. **NOTIFICATION OF ACTION:** Lender shall notify Broker by telephone or facsimile transmission of the conditional approval or rejection of each completed Loan Package. For each Loan conditionally approved by Lender, Lender shall fund the Loan provided that all conditions precedent are satisfied and all documentation as required by Lender is timely executed, acknowledged, and returned to Lender.

7. **AMOUNTS DUE TO BROKER:**
   a. Subject to Sections 7b, 7c, and 7d below, nothing shall be owed to Broker by Lender on account of any proposed Loan which is not closed and funded by Lender. Upon closing of any Loan with respect to which Broker has submitted a Loan Package to Lender, Lender shall pay to Broker an amount equal to the difference between the points charged to the Borrower and the wholesale points which Lender indicates it will keep as stated in the Loan Program Statement provided to Broker, except in the case of zero point loans (i.e., with respect to which the Borrower pays no points) in which case Lender shall remit to Broker the points specified in the Loan Program Statement provided to Broker, provided, however, that in any case, Lender shall deduct from amounts to be remitted to Broker those fees and charges due to Lender. Lender shall also remit to Broker such other consideration as may be agreed from time to time between Broker and Lender pursuant to a separate agreement.
   b. In the event Lender receives conflicting instructions from Broker and the Broker's broker of record as to who should receive any monies due Broker under this Agreement, Lender shall escrow such monies in an interest bearing trust account. Lender shall release such monies and all interest accrued thereon upon the execution and delivery of joint instructions from Broker and the Broker's broker of record.
   c. In the event that a Loan pays off prior to Broker's origination efforts within 120 days after funding and Lender has paid Broker a premium, Broker shall then remit to Lender all of the premium paid within 10 calendar days after Lender has sent written notice to Broker. If Lender funds the refinance loan within 120 days of funding, no premium will be paid to Broker. If Broker fails to remit said payment to Lender within said 10 calendar days, then Lender may reimburse itself for any payments due from Broker out of loan fees from subsequent closings.
   d. In the event that Lender, at its option and sole discretion, determines that Broker has breached any term of this Agreement, Lender may withhold payment of funds due to Broker for any Loan that Lender is funding or is about to fund and for which the amounts due to Broker under this Section 7 have not yet been paid. Such funds will be placed in a separate Trust Account until such time as Lender and Broker have settled Lender's claim that Broker has breached this Agreement.

8. **FAILURE TO SUPPLY A COMPLETE LOAN PACKAGE:** In the event that Broker or Borrower fail to supply to Lender any documentation required or requested with respect to any Loan, Lender shall have the option, at its sole and absolute discretion, to:
   a. commit to make the Loan on the basis of the documentation provided;
   b. commit to make the Loan subject to delivery by Borrower or Broker to Lender of such documentation as Lender specifies in writing at the time such commitment is made; or
   c. reject the Loan.

**9. USE OF APPROVED VENDORS:** In connection with the preparation or submission of any Loan Package, Broker shall not utilize any real estate appraiser, credit reporting agency, or other vendor that is not acceptable to Lender. In the event that Broker shall submit a Loan Package including information or reports from a person or entity not acceptable to Lender, Lender may reject or accept the Loan Package in accordance with Section 8 above.

**10. AUTHORIZATION TO OBTAIN BUSINESS CREDIT REPORT:** Broker authorizes Lender to obtain a business and individual credit report with respect to Broker upon manual execution of this Agreement and from time to time thereafter as deemed necessary or appropriate by Lender. Broker acknowledges and agrees that in the course of its business, Lender conducts quality control audits of Loan Packages. Lender shall have the right to review during Broker's normal business hours the files of Broker related to Loan Packages submitted to Lender.

**11. BROKER'S WARRANTIES:** Broker represents and warrants to Lender, (i) as of the time any Loan Package is submitted to Lender, and (ii) as of the time the Loan is funded and closed, that:

a. No Untrue Statements: Broker shall not submit in any Loan Package any false, fraudulent, inaccurate, or erroneous information or statements, or omit any material facts necessary to make any statement or information included in the Loan Package true, accurate, and understandable. For purposes of this warranty, the term "submit" shall mean (i) submitting a Loan Package to Lender with false, fraudulent, inaccurate, or erroneous information regardless of Broker's actual or prior knowledge of such false, fraudulent, inaccurate, or erroneous information; or (ii) submitting a Loan Package to Lender with false, fraudulent, inaccurate, or erroneous information after failing to follow standard practices and procedures prevalent in the mortgage banking industry; or (iii) submitting a Loan Package to Lender containing an appraisal that contains false, fraudulent, inaccurate, or erroneous information where such information was or should have been within the knowledge or control of appraiser; or (iv) submitting a Loan Package to Lender where the Broker has a "non arms-length" business, financial, or personal affiliation with, or financial interest in, the appraiser.

b. Absence of Claims: Except as previously disclosed to Broker to Lender in writing, there is not pending or, to the best of Broker's knowledge, threatened any suit, action, arbitration, or legal, administrative, or other proceeding or governmental investigation (including an allegation of fraud by another Lender) against Broker or its current or former owners, agents, or employees which could have a material adverse effect on the Broker's business, assets, financial condition, operations, or reputation.

c. Control of Documents: Except where Borrower has been asked to submit any loan documents directly to Broker, no Borrower shall have had in its direct or indirect possession or control any completed credit, income, employment, or deposit verification documents submitted to Lender with respect to any Loan.

d. Duly Licensed: Broker possesses all necessary licenses, permits, and authority to engage in the activities contemplated by this Agreement. If applicable, Broker's license number and its expiration date appear below.

e. Ownership: Except as otherwise disclosed to Lender in writing before the submission of any Loan Package, Broker shall have no direct or indirect ownership interest or financial interest in any property serving as security for the Loan, or in any title company, escrow company, or notary providing settlement services on a Loan. Broker shall not have any financial interest, whether evidenced by ownership or debt, in any property serving as security for the Loan at any time prior to funding of the Loan by Lender except with prior written approval by Lender, or in the Seller of the property in the case of loans sought by Borrowers who are buying the property.

f. Compliance with Laws: With respect to each Loan submitted by Broker and funded by Lender, Broker has complied with all laws and regulations applicable to it as a mortgage broker, and as a Loan correspondent under HUD regulations, including but not limited to the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth in Lending Act, FTC Privacy Regulations and all other applicable local, state, and Federal laws and regulations.

g. Authority: This Agreement and all actions provided for herein have been duly authorized by Broker's Board of Directors, if Broker is a corporation, or by such individual or individuals empowered and authorized to enter into agreements on behalf of Broker. Broker shall provide Lender with evidence reasonably satisfactory to Lender of such authorization. The performance of Broker's duties under this Agreement will not violate the provisions of Broker's organizational documents, any agreement to which it may be a party, or any court order, judgment, or decree to which it may be subject.

h. Valid Documents: All documents submitted to Lender are in every respect valid and genuine, being what on their face they purport to be, and all information (credit or otherwise) submitted in connection with each such a Loan Package is true and accurate.

i. Sale of Loans: Broker has no knowledge of any circumstances or conditions with respect to any Loan, mortgaged property, mortgage, or mortgagor's credit standing that can be reasonably expected to cause any governmental, quasi-governmental, or private institutional investors to regard any Loan as an unacceptable investment, cause any Loan to become delinquent, or adversely affect the value of the security or marketability of the Loan.

**12. STATUS OF BROKER:** Nothing in this Agreement shall be construed as making the Broker a joint venturer, partner, representative, employee, or agent of Lender. Broker shall not hold itself out as such, or shall it use Lender's name in any advertising without Lender's expressed prior written consent. Broker is an independent contractor, and Broker shall determine the method, details, and means of performing all services described in this Agreement.

**13. BROKER'S INDEMNIFICATION:** Broker shall indemnify, defend, and hold Lender and its shareholders, directors, officers, agents, employees, successors, and assigns harmless from and against, and shall reimburse the same with respect to any and all loss, damage, liability, costs, and expenses, including reasonable attorneys' fees (including the allocated cost of in-house counsel), from any cause whatsoever, including but not limited to:

a. any breach of any representation or warranty contained in Section 11 above;

b. Broker's failure to perform any obligation set forth in this Agreement; or

c. any claim by a Borrower resulting from Lender's failure or refusal to fund a Loan (collectively, a "Loss").

Without limiting the generality of the foregoing, Lender's right to indemnification from Broker shall extend to all repurchase or indemnification demands by any third party to which Lender has sold any Loan originally submitted to Lender by Broker. Broker's obligation to indemnify Lender under this Agreement shall arise (i) upon Lender's notification to Broker that a Loss has occurred or (ii) automatically upon Lender's receipt of a Loan repurchase demand from a secondary market investor which Lender determines in its sole and absolute discretion to be enforceable, even if Lender has not incurred any Loss with respect to such Loan.

**14. LENDER'S RIGHTS:** Broker's obligation to fully indemnify Lender under this Agreement shall not be affected by Lender's taking any of the following actions with or without notice to Broker:

a. Entering into a modification or forbearance agreement with Borrower;

b. Liquidation, repayment, retirement, or sale or resale of any Loan;

c. Foreclosure of any Loan, including without limitation Lender's acquisition of the property securing a Loan by making a full credit bid at such foreclosure sale; or

d. Sale or resale of the property securing any Loan.

**15. REPURCHASE AGREEMENT:** In the event of a breach of any warranty or representation contained in Section 11 by Broker, or in the event of a repurchase or indemnification demand from a secondary market investor which Lender determines in its sole and absolute discretion to be enforceable, even if Lender has not incurred any Loss with respect to such Loan, and the Loan in question is closed and funded by Lender, Broker agrees to either: (i) repurchase such a Loan immediately upon written demand therefor, for the repurchase amount set forth in Section 16 hereof; (ii) refinance the Loan at par plus accrued interest and pay any loss, costs, or damages incurred by Lender, or (iii) indemnify Lender pursuant to Section 13. Broker agrees that any breach of this Section 15 may not be adequately compensable in damages alone. Therefore, Broker agrees that, in the event of any breach of Section 15, Lender shall, without limitation, be entitled to seek and obtain equitable relief by way of specific performance or otherwise to enforce Broker's repurchase or indemnification obligation hereunder.

**16. REPURCHASE AMOUNT:** A repurchase pursuant to Section 15 hereof shall be priced as follows:

a. The original principal amount of the Loan, less principal reductions received by Lender; plus

b. All interest accrued but unpaid on the principal balance of the Loan from the date of funding by Lender through and including the first day of the month following the month the repurchase is made; plus

c. All costs and expenses incurred by Lender in connection with origination, processing, funding, and servicing of the Loan; plus

d. All costs and expenses incurred by Lender in enforcing Broker's obligation to repurchase such a Loan, including, without limitation, reasonable attorneys' fees (including the allocated cost of in-house counsel) and costs of suit.

**17. TERMINATION OF AGREEMENT:** Either party may terminate this Agreement at any time, upon written notice to the other party; provided, however, that any termination of this Agreement shall not affect

a. Lender's obligation to pay any amounts due Broker under this Agreement, or

b. The obligations of Broker with respect to Loans funded by Lender pursuant to this Agreement, including, without limitation, the obligation of Broker to indemnify and hold Lender harmless from and against any Loss pursuant to Section 13 hereof, and to repurchase a Loan or indemnify Lender pursuant to Section 15 hereof.

**18. NOTICE OF CERTAIN MATTERS:** Broker hereby covenants and agrees with Lender that Broker shall promptly give written notice to Lender of

a. The occurrence of any breach of a representation or warranty as set forth in Section 11 hereof.

b. Any litigation or proceeding affecting Broker involving (i) amounts in the case of any such individual litigation, investigation, or proceeding in excess of One Thousand Dollars ($1,000), or (ii) which, regardless of the amount in controversy, if adversely determined, could have a material adverse effect on the business, operations, property, or financial or other condition of Broker or on the ability of Broker to perform its obligations hereunder;

c. Receipt by Broker of notice from any agency concerning revocation, suspension, or any other adverse action or potential action relating to any of Broker's licenses to conduct its business;

d. A material adverse change in the business, operations, property, or financial, or other condition of Broker; or

e. Any change in (i) the ownership structure of Broker; (ii) the Broker's broker of record for licensing purposes; or (iii) Broker's name, address, or employer tax identification number.

**19. MISCELLANEOUS:**

a. **Governing Law.** This Agreement is entered into at the City of Larkspur, California and shall be governed by the laws of the State of California.

b. **Notices.** All notices required hereunder shall be in writing and shall be deemed to have been given, made, and received only (i) upon delivery, if personally delivered to a party; (ii) one (1) business day after the date of dispatch, if by facsimile transmission; (iii) one (1) business day after deposit, if delivered by a nationally recognized courier service offering guaranteed overnight delivery; or (iv) three (3) business days after deposit in the United States first class mail, certified mail, postage prepaid, return receipt requested, at the addresses appearing below.

c. **Attorneys' Fees.** If any legal action or other proceeding is brought for the enforcement of any provision of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of the Agreement, the prevailing party or parties shall be entitled to reasonable attorneys' fees (including the allocated cost of in-house counsel) and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled. In addition, any such suit or proceeding shall be brought only in the state courts located in Marin County, State of California, which courts shall have sole and exclusive in personam, subject matter, and other jurisdiction in connection with such suit or proceedings, and venue shall be appropriate for all purposes in such courts.

d. **No Assignment.** Broker may not assign this Agreement.

e. **Entire Agreement; Amendment.** This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous agreements, representations, and understandings. No supplement, modification, or amendment shall be binding unless executed in writing by and agreed to by both parties hereto. This Agreement applies to all present and future Loans, as well as those Loans previously submitted to or closed by Lender.

f. **Waivers and Remedies.** Failure or delay to audit any Loan or to exercise any right shall not act as a waiver of any other right, nor shall any single or partial exercise of any right preclude any other or further exercise thereof. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver. All remedies shall be cumulative and non-exclusive.

g. **Partial Invalidity.** If any provision of this Agreement is held to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in full force and effect.

h. **Arbitration.** Solely at Lender's discretion, Lender may require that all disputes, controversies, or differences between the parties arising out of or related to this Agreement shall be resolved through binding arbitration. If Lender elects not to use arbitration, or if a court of competent jurisdiction rules that Lender's option under this part of the Agreement is invalid, the parties hereto agree that the provisions of Section 19e shall control as to the jurisdiction and venue of any legal action concerning this Agreement. If Lender requires an arbitration to resolve any disputes, controversy, or differences between the parties arising out of or related to this agreement, the arbitration shall occur in San Francisco, California. Arbitration shall be conducted by a single arbitrator in accordance with the then-current commercial arbitration rules and supplementary procedures for commercial arbitration of the American Arbitration Association ("AAA"). Any discovery shall be conducted in accordance with laws of the State of California. The arbitrator shall be selected by the mutual agreement of the parties, or failing such agreement, shall be selected according to AAA rules. Judgment upon any arbitrator's award may be entered in any court of competent jurisdiction. The parties hereby consent to such court's jurisdiction.

i. **Insurance.** Upon the request of Lender, Broker shall, at its sole cost and expense obtain such miscellaneous professional liability or errors and omissions insurance in such amounts and with such companies as Lender may request. Said insurance shall name Lender as an additional insured and shall provide Lender with thirty (30) days prior written notice of cancellation or termination.

j. **Consumer Privacy.** Broker acknowledges Lender's obligations to safeguard customer information and agrees to comply with federal regulations as they apply to Lender's applications and loan files.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of this __10__ day of
__June__ (month), _2002_ (year).

**BROKER:**
NAME: _Utah Financial_
dba:
Address: _4225 Highland Dr._
_Salt Lake City UT 84124_

Telephone: _801-_____
License Number: _Mtg00000089_
Expiration Date: _7-31-03_

By: _[signature]_
(Signature of Owner)
_Brendan Cassity_
(Print Name)
_President_
(Title)

By: _[signature]_
Authorized Broker of Record
_Brendan Cassity_
(Print Name)

**LENDER:**
GREENPOINT MORTGAGE FUNDING, INC.
1100 Larkspur Landing Circle # 101
Larkspur, CA 94939

Telephone: 800-462-2700

By: _[signature]_
(Signature)
_Jess Martin_
(Print Name)
(Title)

# EXHIBIT 2



I hereby certify this to be a true copy of the original
FIRST AMERICAN TITLE COMPANY
By

# ADJUSTABLE RATE NOTE

### Monthly Treasury Average Index - Payment and Rate Caps

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN $668,800.00. THE INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

April 16, 2007                    San Jose                         Utah
[Date]                             [City]                          [State]

8940 CALLE DEL REY, Gilroy, CA  95020

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 608,000.00                    (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GreenPoint Mortgage Funding, Inc.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of                    1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of June, 2007                    , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

### (C) Interest Rate Limit

My interest rate will never be greater than                    12.000%.

### (D) Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding three and one-half percentage points ( 3.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

0092139369

-828N (0005)
VMP MORTGAGE FORMS - (800)521-7291
Customized by GreenPoint Mortgage Funding, Inc.

OPTNCA-OA (03/07)

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on June 1, 2007
I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1, 2037            , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 79363, City of Industry, CA 91716-9363
or
at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,955.57
This amount may change.

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of June, 2008            ", and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last monthly payment due before the Payment Change Date.

### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to 110% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

### (G) Required Full Payment

On 06/01/2012 and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

0092139369

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10                     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be            6.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

0092139369



Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0092139369

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
RICK YU                 -Borrower

_____ (Seal)
SERLYN YU               -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

*[Sign Original Only]*

0092139369

# EXHIBIT 3

Recording Requested By
First American Title
Escrow No. 4311-2746910-
328684/LK

Recording Requested By:
GreenPoint Mortgage Funding, Inc.
Return To:
GreenPoint Mortgage Funding, Inc.
981 Airway Court, Suite E
Santa Rosa, CA 95403-2049

Prepared By:
GreenPoint Mortgage Funding, Inc.
100 Wood Hollow Drive,
Novato, CA 94945

DOCUMENT: 19397315          Pages: 25



Fees.... 81.00
Taxes...
Copies..
AMT PAID 81.00

REGINA ALCOMENDRAS          RDE # 014
SANTA CLARA COUNTY RECORDER  4/24/2007
Recorded at the request of   8:00 AM
First American Title Company

——————————[Space Above This Line For Recording Data]——————————

# DEED OF TRUST

MIN 100013800921393696

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April 16, 2007 ,
together with all Riders to this document.
(B) "Borrower" is RICK  YU  and SERLYN  YU, Husband And Wife, As Joint Tenants

Borrower's address is, 8940 CALLE DEL REY, Gilroy, CA 95020
. Borrower is the trustor under this Security Instrument.
(C) "Lender" is GreenPoint Mortgage Funding, Inc.

Lender is a Corporation
organized and existing under the laws of the State of New York

9369

CALIFORNIA -Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005 1/01

VMP -6A(CA) (0207).01
Page 1 of 15

VMP Mortgage Forms, Inc.

Customized by GreenPoint Mortgage Funding, Inc.

Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**

(D) "Trustee" is **Marin Conveyancing Corp.**

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated **April 16, 2007**
The Note states that Borrower owes Lender **six hundred eight thousand and 00/100**

Dollars

(U.S. $ **608,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2037**

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [x] Occupancy Rider | [x] Interim Interest Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**9369**

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
                    **County**                of               **Santa Clara**                   :
           [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
LOT 11, MAP OF TRACT NO. 9162 "SCHRAMM PROPERTY", FILED SEPTEMBER 09, 1999, MAP BOOK 718, PAGE 53-55, SANTA CLARA COUNTY RECORDS.

Parcel ID Number: 783-35-085                              which currently has the address of
8940 CALLE DEL REY                                                              [Street]
Gilroy                                              [City], California 95020        [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

9369

-6A(CA) (0207).01                         Page 3 of 15                          Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

9369

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

9369

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

9369

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

9369

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

9369

-6A(CA) (0207).01                    Page 9 of 15                    Form 3005   1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

9369

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

9369

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

9369

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
RICK YU                                                    -Borrower

_____ (Seal)
SERLYN YU                                               -Borrower

_____ (Seal)     _____ (Seal)
-Borrower                                                        -Borrower

_____ (Seal)     _____ (Seal)
-Borrower                                                        -Borrower

_____ (Seal)     _____ (Seal)
-Borrower                                                        -Borrower

9369

-6A(CA) (0207).01                    Page 14 of 15                    Form 3006  1/01

State of California
County of *Santa Clara*

On  *4.17.07*           before me,  *Lupe Winans, Notary Public*      } ss.

                                                                personally appeared

RICK YU, SERLYN YU

                                                      , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

                                              _____ (Seal)



LUPE WINANS
Commission # 1425764
Notary Public - California
Santa Clara County
My Comm. Expires Jun 21, 2007

9369

Order No.: 3286841c
Reference No.: YU
Escrow Officer: NICO MENDOZA
Escrow Number: 2746910

## DESCRIPTION

All that certain land situated in the State of California, County of **SANTA CLARA**, City of **GILROY**, described as follows:

**LOT 11, MAP OF TRACT NO. 9162 "SCHRAMM PROPERTY", FILED SEPTEMBER 09, 1999, MAP BOOK 718, PAGE 53-55, SANTA CLARA COUNTY RECORDS.**

APN No: **783-35-085-00**

# EXHIBIT 4

WE HEREBY CERTIFY THIS TO BE A
TRUE COPY OF THE ORIGINAL.
FIRST AMERICAN TITLE COMPANY.
BY _____

# ADJUSTABLE RATE NOTE
### Monthly Treasury Average Index - Payment and Rate Caps

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN $533,500.00. THE INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| April 19, 2007 | San Jose | California |
|---|---|---|
| [Date] | [City] | [State] |

2846 Rainwood Court, San Jose, CA 95148

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $485,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GreenPoint Mortgage Funding, Inc.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 2.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of June, 2007 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

### (C) Interest Rate Limit

My interest rate will never be greater than 12.000%.

### (D) Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding three and one-half percentage points ( 3.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

0092139302

VMP-829N (0005)
®
VMP MORTGAGE FORMS - (800)521-7291
Customized by GreenPoint Mortgage Funding, Inc.

OPTNCA-OA (03/07)

Page 1 of 5

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on June 1, 2007

I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1, 2037                              , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 79363, City of Industry, CA 91716-9363                                                                                                                                                     or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,792.65
This amount may change.

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of June, 2008              , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last monthly payment due before the Payment Change Date.

### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to 110% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

### (G) Required Full Payment

On 06/01/2012 and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

0092139302

OPTNCA-OA (06/06) GreenPoint Mortgage Funding, Inc.
Page 2 of 6



## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

. If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10            calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be            6.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

0092139302

 

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0092139302

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
RICK YU                        -Borrower

_____ (Seal)
SERLYN L. YU                   -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

*[Sign Original Only]*

0092139302

OPTNCA-OA (06/06)  GreenPoint Mortgage Funding, Inc.
Page 6 of 6

# EXHIBIT 5

Recording Requested By
First American Title
Escrow No. _H_ _3M_ - 2746889



Recording Requested By:
**GreenPoint Mortgage Funding,
Inc.**
Return To:
**GreenPoint Mortgage Funding,
Inc.
981 Airway Court, Suite E
Santa Rosa, CA 95403-2049**

Prepared By:
**GreenPoint Mortgage Funding,
Inc.
100 Wood Hollow Drive,
Novato, CA 94945**

DOCUMENT: 19397311

| | Pages: 26 |
| --- | --- |
| Fees.... | 84.00 |
| Taxes... | |
| Copies.. | |
| AMT PAID | 84.00 |

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
First American Title Company

RDE # 014
4/24/2007
8:00 AM

————————————[Space Above This Line For Recording Data]————————————

# DEED OF TRUST

MIN 100013800921393027

**DEFINITIONS**
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **April 19, 2007**
together with all Riders to this document.
**(B) "Borrower"** is **RICK  YU  and SERLYN L. YU, Husband And Wife**

Borrower's address is **8940 CALLE DEL REY, Gilroy, CA 95020**
. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **GreenPoint Mortgage Funding, Inc.**

Lender is a **Corporation**
organized and existing under the laws of **the State of New York**

9302

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005 1/01

(VMP) -6A(CA) (0207) 01
®
Page 1 of 15

VMP Mortgage Forms, Inc.

Customized by GreenPoint Mortgage Funding, Inc.

Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**

**(D) "Trustee"** is **Marin Conveyancing Corp.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **April 19, 2007**
The Note states that Borrower owes Lender **four hundred eighty-five thousand and 00/100** Dollars
(U.S. $**485,000.00**          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2037**          .

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [x] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [ ] Occupancy Rider | [x] Interim Interest Rider | |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

9302

-6A(CA) (0207).01                    Page 2 of 15                    Form 3005  1/01

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

               **County**            of            **Santa Clara**          :
        [Type of Recording Jurisdiction]               [Name of Recording Jurisdiction]

LOT 59, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "TRACT NO. 6474", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, ON MAY 1, 1979 IN BOOK 440 OF MAPS PAGE 45.

Parcel ID Number: **654-50-067**                        which currently has the address of
**2846 Rainwood Court**                                         [Street]
**San Jose**                             [City], California **95148**     [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

                                                                9302

 -6A(CA) (0207).01                      Page 3 of 15                        Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

9302

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

9302

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

9302

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

9302

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

9302

 -6A(CA) (0207).01          Page 8 of 15          Form 3005  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

9302

 -6A(CA) (0207).01                     Page 9 of 15                     Form 3005   1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

9302

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

9302

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

9302

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

9302

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                            RICK YU                        -Borrower

                                            _____ (Seal)
_____          SERLYN L. YU                    -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                    -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                    -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                    -Borrower

9302

-6A(CA) (0207).01                    Page 14 of 15              Form 3006   1/01

State of California
County of Santa Clara } ss.

On 4.19.07 before me, Lupe Winans, Notary Public
personally appeared

RICK YU, SERLYN L. YU

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

LUPE WINANS
Commission # 1425764
Notary Public - California
Santa Clara County
My Comm. Expires Jun 21, 2007

9302

-6A(CA) (0207) 01    Page 15 of 15    Form 3005  1/01

# EXHIBIT 6

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☒ the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower _____

Co-Borrower _____

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☒ Conventional  ☐ Other (explain): ALT A | | Agency Case Number | Lender Case Number |
|---|---|---|---|---|
| | ☐ FHA  ☐ USDA/Rural Housing Service | | | 0092139369 |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☐ Fixed Rate  ☐ Other (explain): |
|---|---|---|---|---|
| $ 608,000.00 | 1.000 % | 360 | | ☐ GPM  ☒ ARM (type): ALT A AP_1MO/1YR TRE |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) | No. of Units |
|---|---|
| 8940 CALLE DEL REY, Gilroy, CA  95020 | 1 |

| Legal Description of Subject Property (attach description if necessary) LOT 11, MAP OF TRACT NO. 9162 "SCHRAMM PROPERTY" | Year Built |
|---|---|
| FILED SEPTEMBER 09, 1999, MAP BOOK 718, PAGE 53-55, SANTA CLARA COUNTY RECORDS. | 2000 |

| Purpose of Loan | ☐ Purchase  ☐ Construction | ☐ Other (explain): | Property will be: |
|---|---|---|---|
| | ☒ Refinance  ☐ Construction-Permanent | | ☒ Primary Residence  ☐ Secondary Residence  ☐ Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | ☐ made  ☐ to be made |
|---|---|---|---|---|---|
| 2000 | $ 459,000.00 | $ 645,000.00 | Lmtd Cash-Out Rate/Term | Cost: $0.00 | |

| Title will be held in what Name(s) RICK YU, SERLYN L YU. | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| | Joint Tenants | ☒ Fee Simple  ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain) |
|---|
| |

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) | RICK  YU | SERLYN  YU |

| | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|---|
| | 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 | (408) 497-2012 | 06/08/1966 | 18 | 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 | (408) 497-2012 | 06/15/1965 | 18 |

| Borrower | Co-Borrower |
|---|---|
| ☒ Married (include registered domestic partners)  ☐ Separated  ☐ Unmarried (include single, divorced, widow ed)  Dependents (not listed by Co-Borrower) no. 0  ages | ☒ Married (include registered domestic partners)  ☐ Separated  ☐ Unmarried (include single, divorced, widow ed)  Dependents (not listed by Borrower) no. 0  ages |

| Present Address (street, city, state, ZIP)  ☒ Own  ☐ Rent 6  No. Yrs. | Present Address (street, city, state, ZIP)  ☒ Own  ☐ Rent 6  No. Yrs. |
|---|---|
| 8940 CALLE DEL REY  Gilroy, CA 95020 | 8940 CALLE DEL REY  Gilroy, CA 95020 |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|
| 8940 CALLE DEL REY  Gilroy, CA 95020 | |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|
| | |

## IV. EMPLOYMENT INFORMATION

| Borrower | | Co-Borrower | |
|---|---|---|---|
| Name & Address of Employer  ☐ Self Employed | Yrs. on this job | Name & Address of Employer  ☐ Self Employed | Yrs. on this job |
| SAN JOSE POLICE DEPT  200 EAST SANTA CLARA STREET  San Jose, CA 95112 | 17.25  Yrs. employed in this line of work/profession  17 | | Yrs. employed in this line of work/profession |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| POLICE OFFICER | (408) 277-4631 | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer  ☐ Self Employed | Dates (from - to) | Name & Address of Employer  ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| | | | |

| Name & Address of Employer  ☐ Self Employed | Dates (from - to) | Name & Address of Employer  ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| | | | |

0092139369
Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
Wolters Kluwer Financial Services
VMP®-21N(CA) (0512).02
Page 1 of 4

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. income* | $ 16,667.00 | $ 0.00 | $ 16,667.00 | Rent | $ 0.00 | //////// |
| Overtime | 0.00 | 0.00 | 0.00 | First Mortgage (P&I) | 1,755.00 | $ 1,955.57 |
| Bonuses | 0.00 | 0.00 | 0.00 | Other Financing (P&I) | 317.00 | 0.00 |
| Commissions | 0.00 | 0.00 | 0.00 | Hazard Insurance | 55.00 | 55.00 |
| Dividends/Interest | 0.00 | 0.00 | 0.00 | Real Estate Taxes | 616.96 | 616.96 |
| Net Rental Income | 0.00 | 0.00 | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 16,667.00 | $ 0.00 | $ 16,667.00 | Total | $ 2,743.96 | $ 2,627.53 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income    Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed ☐ Jointly ☒ Not Jointly

| ASSETS Description | Cash or Market Value | LIABILITIES Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| | | *** SEE ADDENDUM *** | | |
| List checking and savings accounts below | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| ING | | | | |
| | | Acct. no. | | |
| Acct. no. | $ 107,523.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 1189204-1 | $ 3,860.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 118920-2 | $ 222.03 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 118920-22 | $ 3,659.74 | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number & description) | $ | | | |
| | | Acct. no. | | |
| Life insurance net cash value | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Face amount: $ 0.00 | | | | |
| Subtotal Liquid Assets | $ 115,264.77 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 2,025,000.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 89,692.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. | | |
| Other Assets (itemize) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | //////// |
| | | Job-Related Expense (child care, union dues, etc.) Neg. Rent | $ 1,012.26 | //////// |
| | | Total Monthly Payments | $ 1,209.26 | //////// |
| Total Assets a. | $ 2,229,956.77 | Net Worth $ 2,221,242.77 | Total Liabilities b. | $ 8,714.00 |

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) ▼ | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 131 NORTH PHEASANT RD #2058 | R SFR | $ 400000 | $ 131896 | $ 2500 | $ 663 | $ 0 | $ 1212 |
| 2846 RAINWOOD CT | R SFR | 750000 | 482000 | 2050 | 3207 | 555 | -2224 |
| 8940 CALLE DEL REY Gilroy, CA, 95020 | H SFR | 875000 | 604500 | 0 | 2278 | 0 | 0 |
| Totals | | $ 2025000 | $ 1218396 | $ 4550 | $ 6148 | $ 555 | $ -1012 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 0.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | 0.00 |
| d. Refinance (incl. debts to be paid off) | 604,500.00 |
| e. Estimated prepaid items | 90.63 |
| f. Estimated closing costs | 3,118.00 |
| g. PMI, MIP, Funding Fee | 0.00 |
| h. Discount (if Borrower will pay) | 0.00 |
| i. Total costs (add items a through h) | 607,708.63 |
| j. Subordinate financing | 0.00 |
| k. Borrower's closing costs paid by Seller | 0.00 |
| l. Other Credits (explain) | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 608,000.00 |
| n. PMI, MIP, Funding Fee financed | 0.00 |
| o. Loan amount (add m & n) | 608,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -291.37 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | x | | x |
| b. Have you been declared bankrupt within the past 7 years? | | x | | x |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | x | | x |
| d. Are you a party to a lawsuit? | | x | | x |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name, and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | x | | x |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | x | | x |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | x | | x |
| h. Is any part of the down payment borrowed? | | x | | x |
| i. Are you a co-maker or endorser on a note? | | x | | x |
| j. Are you a U.S. citizen? | x | | x | |
| k. Are you a permanent resident alien? | | x | | x |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question below. | x | | x | |
| m. Have you had an ownership interest in a property in the last three years? | x | | x | |
| (1) What type of property did you own - - principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| (2) How did you hold title to the home - - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors, and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 4/17/07 | X  Ashley R. Yu | 4-17-07 |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | [X] I do not wish to furnish this information. | | CO-BORROWER | [X] I do not wish to furnish this information. | |
|---|---|---|---|---|---|
| Ethnicity: | Hispanic or Latino | Not Hispanic or Latino | Ethnicity: | Hispanic or Latino | Not Hispanic or Latino |
| Race: | American Indian or Alaska Native / Asian / Native Hawaiian or Other Pacific Islander | Black or African American / White | Race: | American Indian or Alaska Native / Asian / Native Hawaiian or Other Pacific Islander | Black or African American / White |
| Sex: | Female | Male | Sex: | Female | Male |

| To be Completed by Interviewer: This application was taken by: | Interviewer's Name (print or type) | | Name and Address of Interviewer's Employer |
|---|---|---|---|
| [ ] Face-to-face interview | Interviewer's Signature | Date 04/04/2007 | Utah Financial, Inc |
| [ ] Mail | | | 4001 South 700 East #100 |
| [X] Telephone | Interviewer's Phone Number (incl. area code) | | Salt Lake City, UT 84107 |
| [ ] Internet | (801) 269-2400 | | |

CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>RICK  YU | Agency Case Number: |
| | Co-Borrower:<br>SERLYN  YU | Lender Case Number:<br>0092139369 |

Under California Civil Code 1812.30(j) "Credit applications for the obtainment of money, goods, labor, or services shall clearly specify that the applicant, if married, may apply for a separate account."

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
| X | 4-17-07 | X | 4-17-07 |

0092139369
Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
VMP®-21N(CA) (0512).02                     Page 4 of 4

Addendum for Loan # : 0092139369 - RICK .YU and SERLYN  YU

--- LIABILITIES ---

| | | | |
|---|---|---|---|
| Creditor | :VIRTUALBANK | Acct. # | : 9000007115 |
| Address | :8940 CALLE DEL REY | Balance | : [$510,000.00] |
| | | Payment | : [$1,735.00] |
| C/S/Z | : | Rem. Term | :    291 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| | | | |
|---|---|---|---|
| Creditor | :WACHOVIA MORTGAGE CORP | Acct. # | : 5260007555886 |
| Address | :PAYING OFF, NEW GPM | Balance | : [$432,000.00] |
| | | Payment | : [$1,755.00] |
| C/S/Z | : | Rem. Term | :    247 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| | | | |
|---|---|---|---|
| Creditor | :NATIONAL CITY MORTGAGE | Acct. # | : 4330003792723 |
| Address | :131 NORTH PHEASANT RD #2058 | Balance | : [$131,896.00] |
| | | Payment | : [$663.00] |
| C/S/Z | : | Rem. Term | :    199 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| | | | |
|---|---|---|---|
| Creditor | :WELLS FARGO BANK N A | Acct. # | : 65165179190261998 |
| Address | :8940 CALLE DEL REY | Balance | : [$59,250.00] |
| | | Payment | : [$339.00] |
| C/S/Z | : | Rem. Term | :    175 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| | | | |
|---|---|---|---|
| Creditor | :CITIBANKNA | Acct. # | : 5008169220299466 |
| Address | :PAYING OFF, NEW GPM | Balance | : [$42,701.00] |
| | | Payment | : [$317.00] |
| C/S/Z | : | Rem. Term | :    135 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| | | | |
|---|---|---|---|
| Creditor | :WELLS FARGO BANK N A | Acct. # | : 65165179192471998 |
| Address | :8940 CALLE DEL REY | Balance | : [$35,250.00] |
| | | Payment | : [$204.00] |
| C/S/Z | : | Rem. Term | :    173 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU | | |

| | | | |
|---|---|---|---|
| Creditor | :CHASE | Acct. # | : 4388540011725669 |
| Address | : | Balance | : $7,851.00 |
| | | Payment | : $157.00 |
| C/S/Z | : | Rem. Term | :    51 |
| Acct. Type | :Revolving | | |
| In Name Of | :RICK  YU | | |

| | | | |
|---|---|---|---|
| Creditor | :AMEX | Acct. # | : 050691114012340192 |
| Address | : | Balance | : $863.00 |
| | | Payment | : $40.00 |
| C/S/Z | : | Rem. Term | :    22 |
| Acct. Type | :Revolving | | |
| In Name Of | :RICK  YU | | |

| | | | |
|---|---|---|---|
| Creditor | :GREENPOINT MTG | Acct. # | : 0092139302 |
| Address | : | Balance | : [$482,000.00] |
| | | Payment | : [$3,761.76] |
| C/S/Z | : | Rem. Term | :    129 |
| Acct. Type | :Mortgage | | |
| In Name Of | :RICK  YU and SERLYN  YU | | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date: | Co-Borrower's Signature: | Date: |
|---|---|---|---|
| X | | X | |

Addendum for Loan # : 0092139369 - RICK  YU and SERLYN  YU

--- LIABILITIES ---

| | | |
|---|---|---|
| Creditor | :VIRTUALBANK | Acct. # : 9000007115 |
| Address | :8940 CALLE DEL REY | Balance : [$510,000.00] |
| | | Payment : [$1,735.00] |
| C/S/Z | : | Rem. Term : 291 |
| Acct. Type | :Mortgage | |
| In Name Of | :RICK  YU | |

| | | |
|---|---|---|
| Creditor | :WACHOVIA MORTGAGE CORP | Acct. # : 5260007555886 |
| Address | :PAYING OFF, NEW GPM | Balance : [$432,000.00] |
| | | Payment : [$1,755.00] |
| C/S/Z | : | Rem. Term : 247 |
| Acct. Type | :Mortgage | |
| In Name Of | :RICK  YU | |

| | | |
|---|---|---|
| Creditor | :NATIONAL CITY MORTGAGE | Acct. # : 4330003792723 |
| Address | :131 NORTH PHEASANT RD #2058 | Balance : [$131,896.00] |
| | | Payment : [$663.00] |
| C/S/Z | : | Rem. Term : 199 |
| Acct. Type | :Mortgage | |
| In Name Of | :RICK  YU | |

| | | |
|---|---|---|
| Creditor | :WELLS FARGO BANK N A | Acct. # : 65165179190261998 |
| Address | :8940 CALLE DEL REY | Balance : [$59,250.00] |
| | | Payment : [$339.00] |
| C/S/Z | : | Rem. Term : 175 |
| Acct. Type | :Mortgage | |
| In Name Of | :RICK  YU | |

| | | |
|---|---|---|
| Creditor | :CITIBANKNA | Acct. # : 5008169220299466 |
| Address | :PAYING OFF, NEW GPM | Balance : [$42,701.00] |
| | | Payment : [$317.00] |
| C/S/Z | : | Rem. Term : 135 |
| Acct. Type | :Mortgage | |
| In Name Of | :RICK  YU | |

| | | |
|---|---|---|
| Creditor | :WELLS FARGO BANK N A | Acct. # : 65165179192471998 |
| Address | :8940 CALLE DEL REY | Balance : [$35,250.00] |
| | | Payment : [$204.00] |
| C/S/Z | : | Rem. Term : 173 |
| Acct. Type | :Mortgage | |
| In Name Of | :RICK  YU | |

| | | |
|---|---|---|
| Creditor | :CHASE | Acct. # : 4388540011725669 |
| Address | : | Balance : $7,851.00 |
| | | Payment : $157.00 |
| C/S/Z | : | Rem. Term : 51 |
| Acct. Type | :Revolving | |
| In Name Of | :RICK  YU | |

| | | |
|---|---|---|
| Creditor | :AMEX | Acct. # : 050691114012340192 |
| Address | : | Balance : $863.00 |
| | | Payment : $40.00 |
| C/S/Z | : | Rem. Term : 22 |
| Acct. Type | :Revolving | |
| In Name Of | :RICK  YU | |

| | | |
|---|---|---|
| Creditor | :GREENPOINT MTG | Acct. # : 0092139302 |
| Address | : | Balance : [$482,000.00] |
| | | Payment : [$3,761.76] |
| C/S/Z | : | Rem. Term : 129 |
| Acct. Type | :Mortgage | |
| In Name Of | :RICK  YU and SERLYN  YU | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date: | Co-Borrower's Signature: | Date: |
|---|---|---|---|
| X | 4-17-07 | X | 4-19-07 |

# EXHIBIT 7

## Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☒ the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower _____

Co-Borrower _____

### TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☒ Conventional  ☐ Other (explain): ALT A | | Agency Case Number | Lender Case Number |
|---|---|---|---|---|
| | ☐ FHA  ☐ USDA/Rural Housing Service | | | 0092139302 |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☐ Fixed Rate  ☐ Other (explain): |
|---|---|---|---|---|
| $ 485,000.00 | 2.000  % | 360 | | ☐ GPM  ☒ ARM (type): ALT A AP_1MO/1YR TRE |

### PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) | No. of Units |
|---|---|
| 2846 Rainwood Court, San Jose, CA  95148 | 1 |

| Legal Description of Subject Property (attach description if necessary)  LOT 59, AS SHOWN ON THAT CERTAIN MAP ENTITLED, | Year Built |
|---|---|
| "TRACT NO. 6474", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA | 1979 |

| Purpose of Loan | ☐ Purchase  ☐ Construction | ☐ Other (explain): | Property will be: |
|---|---|---|---|
| | ☒ Refinance  ☐ Construction-Permanent | | ☐ Primary Residence  ☐ Secondary Residence  ☒ Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | |
|---|---|---|---|---|---|
| 1992 | $ 340,000.00 | $ 470,000.00 | Lmtd Cash-Out Rate/Term | ☐ made  ☐ to be made | |
| | | | | Cost: $0.00 | |

| Title will be held in what Name(s)  RICK YU, SERLYN L YU | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| | Joint Tenants | ☒ Fee Simple  ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain) |
|---|
| |

### BORROWER INFORMATION / CO-BORROWER INFORMATION

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|
| RICK  YU | SERLYN L. YU |

| Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|
| 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 | (408) 497-2812 | 06/09/1966 | 18 | 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 | (408) 497-2812 | 06/15/1965 | 18 |

| ☒ Married (include registered domestic partners)  ☐ Separated  ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Co-Borrower) no.  ages  0 | ☒ Married (include registered domestic partners)  ☐ Separated  ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Borrower) no.  ages  0 |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  ☒ Own  ☐ Rent 6  No. Yrs. | Present Address (street, city, state, ZIP)  ☒ Own  ☐ Rent 6  No. Yrs. |
|---|---|
| 8940 CALLE DEL REY | 8940 CALLE DEL REY |
| Gilroy, CA 95020 | Gilroy, CA 95020 |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|
| 8940 CALLE DEL REY | |
| Gilroy, CA 95020 | |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent ___  No. Yrs. | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent ___  No. Yrs. |
|---|---|
| | |

### EMPLOYMENT INFORMATION

| Name & Address of Employer  ☐ Self Employed | Yrs. on this job | Name & Address of Employer  ☐ Self Employed | Yrs. on this job |
|---|---|---|---|
| SAN JOSE POLICE DEPT | 17.25 | | |
| 200 EAST SANTA CLARA STREET | Yrs. employed in this line of work/profession | | Yrs. employed in this line of work/profession |
| San Jose, CA 95112 | 17 | | |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| POLICE OFFICER | (408) 277-4631 | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer  ☐ Self Employed | Dates (from - to) | Name & Address of Employer  ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income  $ | | Monthly Income  $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer  ☐ Self Employed | Dates (from - to) | Name & Address of Employer  ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income  $ | | Monthly Income  $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

0092139302
Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
Wolters Kluwer Financial Services
VMP®-21N(CA) (0512).02
Page 1 of 4

## MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 16,667.00 | $ 0.00 | $ 16,667.00 | Rent | $ 0.00 | |
| Overtime | 0.00 | 0.00 | 0.00 | First Mortgage (P&I) | 3,263.88 | $ 1,792.65 |
| Bonuses | 0.00 | 0.00 | 0.00 | Other Financing (P&I) | 0.00 | 0.00 |
| Commissions | 0.00 | 0.00 | 0.00 | Hazard Insurance | 55.00 | 55.00 |
| Dividends/Interest | 0.00 | 0.00 | 0.00 | Real Estate Taxes | 616.96 | 500.00 |
| Net Rental Income | 0.00 | 0.00 | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 16,667.00 | $ 0.00 | $ 16,667.00 | Total | $ 3,935.84 | $ 2,347.65 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income    Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed [ ] Jointly [x] Not Jointly

| ASSETS | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Description | | | | |
| Cash deposit toward purchase held by: | $ 0.00 | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| | | Name and address of Company | $ Payment/Months | $ |
| List checking and savings accounts below | | *** SEE ADDENDUM *** | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| ING DIRECT | | | | |
| | | Acct. no. | | |
| Acct. no. | $ 107,523.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 118920-1 | $ 3,659.59 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 118920-2 | $ 222.03 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| SAN JOSE CU | | | | |
| | | Acct. no. | | |
| Acct. no. 118920-22 | $ 3,659.74 | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number & description) | $ | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value | $ 0.00 | | | |
| Face amount: $ 0.00 | | | | |
| Subtotal Liquid Assets | $ 115,264.36 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 2,025,000.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 89,692.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. | | |
| Other Assets (itemize) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| | | Job-Related Expense (child care, union dues, etc.) Neg. Rent | $ 1,012.26 | |
| | | Total Monthly Payments | $ 1,209.26 | |
| Total Assets a. | $ 2,229,956.36 | Net Worth (a minus b) $ 2,221,242.36 | Total Liabilities b. | $ 8,714.00 |

0092139302
Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
VMP®-21N(CA) (0512).02    Page 2 of 4

## VI. ASSETS AND LIABILITIES (cont'd)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 131 North Pleasant Road | R / COND | $ 400000 | $ 131896 | $ 2500 | $ 663 | $ 0 | $ 1212 |
| 9940 CALLE DEL REY | H / SFR | 875000 | 608000 | 0 | 3264 | 555 | 0 |
| 2846 Rainwood Court San Jose, CA, 95148 | R / SFR | 750000 | 482000 | 2050 | 3207 | 555 | -2224 |
| | Totals | $ 2025000 | $ 1221896 | $ 4550 | $ 7134 | $ 1110 | $ -1012 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 0.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | 0.00 |
| d. Refinance (incl. debts to be paid off) | 478,000.00 |
| e. Estimated prepaid items | 60.97 |
| f. Estimated closing costs | 3,905.00 |
| g. PMI, MIP, Funding Fee | 0.00 |
| h. Discount (if Borrower will pay) | 0.00 |
| i. Total costs (add items a through h) | 481,965.97 |
| j. Subordinate financing | 0.00 |
| k. Borrower's closing costs paid by Seller | 0.00 |
| l. Other Credits (explain) | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 485,000.00 |
| n. PMI, MIP, Funding Fee financed | 0.00 |
| o. Loan amount (add m & n) | 485,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -3,034.03 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | x | | x |
| b. Have you been declared bankrupt within the past 7 years? | | x | | x |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | x | | x |
| d. Are you a party to a lawsuit? | | x | | x |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name, and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | x | | x |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | x | | x |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | x | | x |
| h. Is any part of the down payment borrowed? | | x | | x |
| i. Are you a co-maker or endorser on a note? | | x | | x |
| j. Are you a U.S. citizen? | x | | x | |
| k. Are you a permanent resident alien? | | x | | x |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | | x | | x |
| m. Have you had an ownership interest in a property in the last three years? | x | | x | |
| (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in the application and/or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 4/19/07 | X | 4/19/07 |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | [X] I do not wish to furnish this information. | | CO-BORROWER | [X] I do not wish to furnish this information. | |
|---|---|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White | | Race: | ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White | |
| Sex: | ☐ Female ☐ Male | | Sex: | ☐ Female ☐ Male | |

| To be Completed by Interviewer This application was taken by: | Interviewer's Name (print or type) | | Name and Address of Interviewer's Employer |
|---|---|---|---|
| ☐ Face-to-face interview | | | Utah Financial, Inc |
| ☐ Mail | Interviewer's Signature | Date 04/04/2007 | 4001 South 700 East #100 |
| [X] Telephone | Interviewer's Phone Number (Incl. area code) | | Salt Lake City, UT 84107 |
| ☐ Internet | (801) 269-2400 | | |

VMP®-21N(CA) (0512).02    Page 3 of 4    0092139302

Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05

| | CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION | Agency Case Number: |
|---|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>RICK  YU | |
| | Co-Borrower:<br>YU,  SERLYN  L. | Lender Case Number:<br>0092139302 |

Under California Civil Code 1812.30(j) "Credit applications for the obtainment of money, goods, labor, or services shall clearly specify that the applicant, if married, may apply for a separate account."

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature:<br>X | Date<br>4-19-07 | Co-Borrower's Signature:<br>X | Date<br>4/19/07 |
|---|---|---|---|

0092139302
Freddie Mac Form 65 7/05
Fannie Mae Form 1003 7/05
VMP®-21N(CA) (0512) 02

Page 4 of 4